IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| BOBBY LEE CUTTS, JR., | ) | CASE NO. 5:11-CV-00991 |
| | ) | |
| Petitioner, | ) | JUDGE JAMES S. GWIN |
| | ) | |
| v. | ) | MAGISTRATE JUDGE |
| | ) | KATHLEEN B. BURKE |
| KEITH SMITH, WARDEN | ) | |
| | ) | |
| | ) | **REPORT AND RECOMMENDATION** |
| Respondent. | ) | |

Petitioner, Bobby Lee Cutts, Jr. ("Cutts" or "Petitioner"), filed this habeas corpus action pursuant to 28 U.S.C. § 2254 on May 17, 2011.  Doc. 1.  Cutts challenges the constitutionality of his conviction and sentence in *State of Ohio v. Bobby Lee Cutts, Jr.*, Case No. 2007CR1098-A (Stark County), and asserts ten grounds for relief.[1]  A jury found Cutts guilty on the lesser included offense of murder (Count One), two counts of aggravated murder, each with three capital specifications (Counts Two and Three), aggravated burglary (Count Four), two counts of abuse of a corpse (Counts Five and Six), and child endangering (Count Seven).  Exhibits 45, 46. He was sentenced to a total term of fifty-seven years to life imprisonment, with a mandatory period of post release control of five years.  Exhibit 48.

This matter has been referred to the undersigned for a Report and Recommendation pursuant to Local Rule 72.2.[2]  For the reasons set forth below, the undersigned concludes that a portion of Ground One and the entirety of Grounds Four, Seven and Eight are procedurally

---

[1] Cutts's federal habeas grounds for relief (Grounds One through Ground Ten) are set forth below in Section II.C.

[2] The case was initially referred to United States Magistrate Judge Baughman but was reassigned to the undersigned Magistrate Judge pursuant to General Order 2011-18.

defaulted; Ground Ten is moot; and a portion of Ground One and the entirety of Grounds Two, Three, Five, Six and Nine are without merit.  Accordingly, the undersigned recommends that Cutts's Petition for writ of habeas corpus (Doc. 1) be **DENIED**.

## I.  Factual Background

In a habeas corpus proceeding instituted by a person in custody pursuant to the judgment of a state court, the state court's factual findings are presumed correct. 28 U.S.C. § 2254(e)(1). The petitioner has the burden of rebutting that presumption by clear and convincing evidence. 28 U.S.C. § 2254(e)(1); *see also Railey v. Webb*, 540 F. 3d 393, 397 (6th Cir. 2008), *cert. denied*, 129 S. Ct. 2878 (2009). The Fifth District Court of Appeals set forth facts underlying Cutts's conviction as follows:[3]

> {¶ 1} On August 23, 2007, the Stark County Grand Jury indicted Appellant, Bobby Lee Cutts, Jr., on seven counts involving the homicide of Jessie Marie Davis and her unborn child. The Indictment charged Appellant with one count of aggravated murder in the death of Davis, in violation of R.C. § 2903.01(B), carrying two death penalty specifications ("Count One"); one count of aggravated murder for the unlawful termination of Jessie's pregnancy, in violation of R.C. § 2903.01(B), carrying three death penalty specifications ("Count Two"); one count of aggravated murder of a viable, unborn child, in violation of R.C. § 2903.01(C), with three death penalty specifications ("Count Three"); one count of aggravated burglary, in violation of R.C. § 2911.11(A)(1) ("Count Four"); two counts of gross abuse of a corpse, in violation of R.C. § 2927.01(B) ("Counts Five and Six"); and one count of child endangering, in violation of R.C. § 2919.22(A) ("Count Seven"). Appellant appeared before the trial court on August 24, 2007, and entered a plea of not guilty to the Indictment.

> {¶ 2} Prior to jury selection, the trial court granted Appellant's motion for special procedures to insulate the venire and the impaneled jury. Prospective jurors were mailed a petit juror summons, a cover letter, and a general questionnaire. The State and Appellant approved the content and mailing of these items. Potential jurors appeared on January 15, 16, and 17, 2008, to complete death penalty and pre-publicity questionnaires. Approximately two weeks later, the prospective

---

[3] The facts are taken from the Fifth District Court of Appeals' July 22, 2009, decision. *State of Ohio v Bobby Lee Cutts, Jr.*, 2009 WL 2170687 (5th Dist. 2009).  Cutts has not demonstrated by clear and convincing evidence that the state court's factual findings were incorrect. Accordingly, the state court's findings are presumed correct. *See* 28 U.S.C. § 2254(e)(1); *see also Railey v. Webb*, 540 F. 3d at 397.

jurors returned to court for a hearing regarding the answered questionnaires. The trial court ordered all general questionnaires, as well as the death penalty and pre-publicity questionnaires, to be sealed.

{¶ 3} On February 4, 2008, the matter proceeded to jury trial.

{¶ 4} During her testimony, Patricia Porter, Jessie Davis's mother, testified that on June 13, 2007, Jessie dropped off her son, Blake, at Porter's home. She stated that her other daughter, Audrey Davis, would watch Blake until Porter returned from work. Porter was not present later that day when Jessie picked up Blake, but spoke with her daughter at approximately 9:00 p.m., during which time Jessie told Porter that Appellant would be picking Blake up that evening and that Blake would be with him the following day, June 14, 2007. Porter testified that she and Audrey made attempts to contact Jessie on her cell phone on June 14, 2007, but her phone went directly to voicemail. Porter said she made an additional attempt to contact Jessie later that evening but was unsuccessful. Porter assumed Jessie was asleep and that she would talk to her in the morning.

{¶ 5} Porter stated that she again tried to contact Jessie at approximately 6:00 a.m. the next day, June 15, 2007, but did not get an answer. When Jessie did not show up to drop off Blake at Porter's house at their usual time of 7:00 a.m., Porter and Audrey went to Jessie's residence. Porter entered Jessie's residence through the back sliding glass door which she had found unlocked. She stated that she entered the kitchen and began calling for Jessie. She testified that as she walked in, she saw the contents of Jessie's purse dumped onto the floor. Blake ran into the kitchen in a wet and soiled diaper. Porter recalled that she actually smelled the child before she saw him. Porter stated that she asked Blake where his mother was, to which he responded, "Mommy is crying. Mommy broke the table. Mommy is in the rug." Porter stated that she ran upstairs, calling for Jessie. Once inside Jessie's bedroom, Porter found the mattress knocked partially off the bed, a table and lamp knocked over, and bleached patches on the floor. Porter also noticed the burgundy and gold comforter from Jessie's bed was missing. Porter ran frantically throughout the house searching for Jessie. When she did not find her daughter, Porter called 911. Porter recalled that she then told Audrey to telephone Appellant. A neighbor, who had heard Porter's screams, arrived and assisted with Blake. Police arrived at the scene, as did Appellant.

{¶ 6} Porter testified that Appellant telephoned her the following day, asking to speak with Blake, but Blake did not want to speak to him. Porter said she asked Appellant if he had done anything to Jessie, and that he responded with a "No". Porter said that she told Appellant she would support him until she had reason not to do so. Porter stated that Appellant then asked if Blake had seen "everything", and Porter replied, "Yes, I believe he did." (Feb. 4, 2008, T. at 96).

{¶ 7} Darin Baad, a deputy sheriff with the Stark County Sheriff's Office, testified that he was working the day shift on June 15, 2007, when he volunteered to

respond to a call regarding a missing person and a possible burglary. Baad was the first officer to arrive at the scene. Baad stated that he spoke with Porter, who explained why she had called the police. The deputy entered the residence and proceeded upstairs to Jessie's bedroom. Inside the bedroom, Baad stated that he found the mattress shifted off the box spring, a lamp and a table knocked over, a bottle of bleach, and a large stain on the rug. The deputy testified that he continued through the rest of the house, noticing a purse on the floor of the kitchen. While Baad was in the basement, Appellant entered the residence. Baad questioned Appellant as to his reason for being at Jessie's home. Appellant informed the deputy that he and Jessie had a child together and that he had been called by either Porter or Audrey. Together with Appellant, Baad inspected the garage and the trunk of Jessie's car. Baad then exited the residence. At that point, a number of other law enforcement officers had arrived and Baad shared the information he had obtained with them. The deputy testified that local hospitals had been contacted, but the hospitals had no information regarding Davis or any Jane Does. Deputy Baad stated that he examined Blake to determine if he needed any medical assistance, as he was concerned the child may have ingested the bleach. Although the deputy and other officers spoke with neighbors, they were unable to gather any additional information as to Jessie's whereabouts.

{¶ 8} Sergeant Eric Weisburn with the Stark County Sheriff's Office testified that he was the shift supervisor on June 15, 2007. Although he was on his way to court when he heard the initial dispatch, he decided to respond to the scene as the call suggested something out of the ordinary had occurred. En route, he contacted the dispatcher with instructions for any officer or deputy at the scene to clear the house. Sergeant Weisburn stated that upon arriving at the Davis residence, he conferred with the other officers and learned about Appellant's connection to Davis. Sergeant Weisburn stated upon reviewing the scene, he observed the purse spilled on the kitchen floor and the state of disarray in the bedroom. Sergeant Weisburn spoke with Appellant to ascertain any information he may have had about Jessie's whereabouts. While speaking with Appellant, Sergeant Weisburn observed that Appellant had a band-aid on the pinky finger of his left hand. Appellant stated that he had cut himself while cleaning out a patio fireplace.

{¶ 9} After speaking with Appellant, Weisburn proceeded to speak with Blake. The sergeant asked the child if he knew where his mother was, to which Blake replied, "Mommy is at work." After some time, Blake stated, "Mommy is crying. Mommy is in the rug. Mommy broke the table." Sergeant Weisburn testified that these last statements were not given as answers to any questions he had posed to Blake, and that Blake repeated the statements several times. Blake also stated, "Daddy's mad." Sergeant Weisburn asked the child why his daddy was mad, but Blake just continued to repeat "Daddy's mad." Sergeant Weisburn stated that he then proceeded to collect and read Porter and Audrey's written statements and that prior to leaving the scene, he asked Appellant to return to the sheriff's office with him for further questioning. Weisburn stated that he wished to speak with Appellant in hopes of creating a better timeline of events.

4

{¶ 10} Appellant arrived at the sheriff's department at approximately 1:00 p.m. that day. Sgt. Weisburn stated that Appellant told him about the attempts he had made to reach Davis on her cell phone. He also informed the sergeant that the previous day, June 14, 2007, he picked up his friend, Myisha Ferrell, to babysit Blake, while he was at football practice. Appellant continued to deny any knowledge of Jessie's whereabouts. Following the interview at the sheriff's department, Sergeant Weisburn followed Appellant to his home. Appellant allowed the sergeant to inspect his home, including a shed and water well.

{¶ 11} Later that day, Sergeant Weisburn and Captain Shankle began to follow up with those individuals whose names Appellant had provided to them. Sergeant Weisburn stated that he spoke with Kelly Cutts, Appellant's wife, who verified the timeline Appellant had given to him. The officers were also able to verify Kelly Cutts's whereabouts during the same timeframe.

{¶ 12} The following day, June 16, 2007, Sergeant Weisburn contacted Myisha Ferrell to set up an interview. When the sergeant arrived at her home for said interview, he was informed that Ferrell had company and that he needed to return in thirty minutes to meet with her. Sergeant Weisburn stated that he returned to Ferrell's residence, but no one responded to his knock on the door. He attempted to call the residence, but did not get a response. Sometime later, a third attempt was made to speak with Ferrell; however, that attempt was also unsuccessful. Sgt. Weisburn contacted Appellant, who informed him that Ferrell was at his home and he was welcome to come there and speak with her. Sgt. Weisburn stated that he declined this offer and made arrangements to meet Ferrell later that evening. Larry Davidson, Appellant's cousin, drove Ferrell from Appellant's residence to her house. Davidson remained at Ferrell's house while Sergeant Weisburn spoke with her. Ferrell corroborated Appellant's version of the events.

{¶ 13} On June 18, 2007, the FBI contacted the Stark County Sheriff's Department and offered their services. The FBI and the Sheriff's Department worked together on any and all leads regarding Jessie's disappearance. The investigation team collected DNA samples from Jessie's family, Appellant, and Ferrell. During the week following Jessie's disappearance, the investigative team uncovered information which conflicted with the information provided by Appellant. Appellant had told Sergeant Weisburn he left Champs Bar on the evening of June 13, 2007, and went directly home. However, it was subsequently discovered that Appellant visited Stephanie Hawthorne after he left the bar. Appellant had failed to mention Hawthorne during his previous conversations with law enforcement officials. Law enforcement officials also learned that the telephone call Appellant made to Jessie's cell phone at approximately 7:15 a.m. on June 14, 2007, was made from a location in Summit County, not from Appellant's residence as he had informed them.

{¶ 14} During the following week, Appellant pretended to assist in the search for Davis. However, on June 23, 2007, Appellant and Attorney Brad Iams, who was representing Appellant at the time, arrived at FBI offices and informed the investigation team that he would take them to the location of Jessie's body. After driving approximately two hours, Appellant was able to navigate the investigators to an area in the Hampton Hills Park in Summit County, Ohio. It was there that the investigators found Jessie's body located forty or fifty feet down an embankment. Thereafter, Appellant was placed under arrest.

{¶ 15} Myisha Ferrell, a friend of Appellant since middle school, testified that on the evening of June 13, 2007, she and three girlfriends went to bingo, to the home of the father of one of her friends, and to a sports bar, before returning to her home. When the women returned to Ferrell's residence, they stayed up all night, playing cards, drinking beer, and smoking marijuana. She stated that sometime after 6:00 a.m., on the morning of June 14, 2007, Appellant arrived at her home, which she found unusual because Appellant always telephoned first before coming over. She testified that Appellant told her that he needed to talk to her and that he needed some help. Ferrell stated that she could tell something was wrong with Appellant and described his appearance as "dysfunctional", explaining that he just didn't look right. Ferrell noted that she had never seen Appellant look that way. She stated that she walked with Appellant to his truck, which was parked in an alley near her house. Ferrell acknowledged that she was high on marijuana, but understood what was happening. She stated that she got in the truck with Appellant and they proceeded to Interstate 77, where Appellant began to head north.

{¶ 16} Ferrell stated that as they drove, Appellant told her something was wrong and something bad had happened. Ferrell described Appellant as "nervous looking." Ferrell stated that she did not question Appellant but that after a period of silence, he went on to state that something was wrong with "the baby's mother." Ferrell knew Appellant was referring to his son Blake's mother. She testified that Appellant eventually informed her that Davis's body was in the back of his pick-up truck. Ferrell stated that she asked Appellant what had happened and that he responded with a gesture, raising his arm around his neck. Ferrell asked Appellant about Blake, and Appellant stated that Blake was at the house. Ferrell testified that she thought Appellant meant his house. She said that Appellant made a brief stop at a truck stop in order for Ferrell to use the restroom and that Appellant remained outside of the truck while he waited for her to return.

{¶ 17} She stated that once they were again on the road, they passed a sign which read "Cuyahoga Falls Parks," at which time Appellant stopped his truck in an open field. Both Appellant and Ferrell exited the vehicle. In the bed of the truck, Ferrell observed a pair of feet. When asked by the prosecutor if there was anything preventing her from seeing more, Ferrell responded that she did not see and she "didn't want to see nothing else." Ferrell also stated that she noticed white trash bags in the bed of the truck, and that she could see a burgundy print through

6

the bag. Ferrell then watched as Appellant removed Jessie's body from the truck and walked away. Appellant returned to his truck and the pair traveled back to Canton.

{¶ 18} Ferrell testified that during the return drive, Appellant stopped and deposited the trash bags into a dumpster. She stated that Appellant also stopped a second time at a gas station, washed his truck, and purchased bags of mulch which he placed in the bed of the truck. She recalled that Appellant also placed a call to Jessie's cell phone and left a message asking her why she had never dropped off Blake. Ferrell stated that Appellant then handed her a pink cell phone, which she knew did not belong to him, and Ferrell threw it out the window of the truck. She also recalled that Appellant placed another telephone call to an individual with whom he coached to tell him that he would be late for practice. She said that the two of them then proceeded to Appellant's house, where Appellant took a shower and dressed in wind pants and a t-shirt. Ferrell testified that Appellant asked her if she could see any marks on his chest, but stated that what she saw looked "vague." Ferrell recalled that Appellant had an injury on his pinky finger. When she asked him what had happened, Appellant told her "she" bit him. Ferrell stated that she knew he was referring to Davis. She stated that Appellant then gave her $100.00, and told her that he wished he could give her more. Ferrell testified that she remained at Appellant's residence while he went to football practice. She stated that Appellant and his daughter returned to his house at approximately 1:00 p.m., and then he drove Ferrell home.

{¶ 19} Ferrell testified that the following day Appellant telephoned her and informed her that his baby's mom was missing. Ferrell stated that she thought Appellant was crazy. She stated that Larry Davidson arrived at her house sometime later that day and drove her to Appellant's house. She stated that Appellant instructed her to tell the police she was going to babysit Blake, but that Davis never dropped off the child. After Davidson drove Ferrell back to her house, someone from the sheriff's department arrived to speak with her. She stated that Davidson waited in her living room while she spoke with the sheriff's department in another room. Ferrell stated that afterwards, she returned to Appellant's house and remained there until she needed to leave to go to work on the midnight shift at a Denny's Restaurant. Ferrell was arrested on June 24, 2007.

{¶ 20} The jury also heard testimony from Larry Davidson, Appellant's cousin. He recalled that he was at Appellant's house on June 16, 2007, during which time Appellant told him that Ferrell wanted to come over and asked Davidson to pick her up. A couple of friends were at Ferrell's house when Davidson arrived. After the friends departed, Davidson and Ferrell waited approximately half an hour for the sheriff's deputies. However, the deputies did not show up, so Davidson drove Ferrell to Appellant's house. At Appellant's house, Davidson, Ferrell, Appellant and his mother sat in the kitchen talking. Davidson and Ferrell stayed at Appellant's house for thirty to forty-five minutes and then returned to Ferrell's house in order for her to speak with the deputies. Davidson remained at Ferrell's

house while she spoke with the deputies. Thereafter, Davidson and Ferrell returned to Appellant's house. Davidson drove Ferrell to work later that evening.

{¶ 21} The State presented a number of other witnesses whose testimony created a timeline for Appellant's whereabouts between 6:00 p.m. on Wednesday, June 13, 2007, and 2:00 a.m. on Thursday, June 14, 2007. On Wednesday evening, Appellant played softball. The game started between 6:00 p.m. and 6:30 p.m. Following the game, he spoke with some friends and then proceeded to Champs Bar, arriving at approximately 8:15 p.m. to 8:30 p.m. Appellant had a couple of beers and socialized with friends, including Denise Haidet, with whom Appellant had previously had an affair. He exited the bar sometime around 12:30 a.m. At approximately on 1:00 a.m., Appellant arrived at the home of Stephanie Hawthorne, another girlfriend. Appellant stayed with Hawthorne until 2:00 a.m. Hawthorne called Appellant's cell phone at 2:14 a.m. and spoke with him briefly.

{¶ 22} Kelly Schaub, fka Kelly Cutts, testified she and Appellant were married on July 28, 2001, and had one child, who was six at the time of trial. Schaub and Cutts separated for a period of approximately nine months between November or December, 2003, and September, 2004. Prior to reconciling in September, 2004, Appellant informed Schaub he had had a one-night stand and, as a result, the woman had become pregnant with his child. Schaub testified Cutts became obligated to pay child support, which she assumed to be approximately $240.00 every two weeks. The couple separated again in June or July, 2005, until October, 2005. Schaub moved out of the couples' residence permanently in February, 2007. Their divorce was final on December 31, 2007.

{¶ 23} {¶ 23} Schaub recalled that Appellant telephoned her after his softball game on June 13, 2007. Appellant told Schaub that he was at Champs Bar having a drink. During the conversation, Appellant talked about their relationship, stating he had always wanted the relationship to work. Appellant also told Schaub he wished they could get back together. She further recalled that during a conversation on June 14, 2007, Appellant told her that Jessie was supposed to drop off Blake that morning, but that he had to have Ferrell watch the child because he forgot he had a football practice meeting that day. During her testimony, Schaub acknowledged she knew about Appellant's relationship with Davis. She testified that she learned Davis had become pregnant again in November, 2006, and had found out because Davis told her.

{¶ 24} On cross-examination, Schaub stated that she continued to have concerns about Appellant's relationship with Davis after the couple had reconciled. Schaub detailed an incident which occurred in November, 2005, recalling that as she was getting ready for work, she opened her makeup drawer and found a pair of underwear which did not belong to her. Schaub later learned from Davis that the underwear belonged to her. Schaub told Appellant about the conversation she had with Davis and stated that she did not believe Appellant's response to Davis with regard to the incident was forceful enough. Schaub says that shortly thereafter,

8

she received a phone call from Davis and that during the call she told Davis that she and Appellant were happily married, and they were all living together with their daughter in their house. Schaub also recalled other telephone calls, initiated by Davis, during which Schaub repeatedly told Davis that she and Appellant were together and living as a family with their daughter. Schaub says that she told both Appellant and Davis numerous times that Davis was not allowed in the home when she dropped off Blake. During the summer of 2006, Schaub said that she received another phone call from Davis telling her that she and Appellant had engaged in sexual relations on Schaub's new patio furniture. Schaub testified that she confronted Appellant about her conversations with Davis but that he simply shrugged off the incidents.

{¶ 25} Richard Mitchell, a close friend of Appellant, testified that approximately one month prior to the disappearance of Davis, Appellant told him he was "going to kill that bitch and throw her in the woods." Mitchell stated he did not think Appellant was serious when he made the statement. Mitchell could not recall the context in which the statement was made.

{¶ 26} Craig Polifrone, Jessie's obstetrician/gynecologist, testified that he examined Davis on June 4, 2007, and that she was thirty-five weeks, and six days along in her pregnancy at that time. He stated that he saw Davis again on June 11, 2007, and that there were no complications with the baby and all testing done showed normal results. Dr. Polifrone testified that at that stage in the pregnancy, the baby would have been viable if Davis had delivered it one or two days after he saw her. The doctor added the chance of a baby dying at that gestational age was extremely low.

{¶ 27} Dr. Lisa Kohler, the chief medical examiner for Summit County, testified that she was present at the Hampton Hills Metropark on June 23, 2007. She testified that photographs were taken, and the location and condition of the body were documented. She stated that Jessie's body and the comforter, in which she was wrapped, along with a number of small bones and fingernails found on the ground underneath where the body had been positioned, were placed inside a body bag for transport to the coroner's office.

{¶ 28} Dr. Kohler testified that she performed an autopsy the following day. She explained that due to the advanced state of decomposition, she took x-rays to determine whether any projectiles or sharp objects remained in the body. Dr. Kohler stated that her external autopsy of Jessie's body revealed a very advanced state of decomposition, and the portion of her body which had been in contact with the ground was largely skeletonized. The remaining flesh on the body was dark, dried out, and leather-like. Dr. Kohler stated that she was able to observe the fetus inside Jessie's body during her external autopsy. The medical examiner went on to explain that she was able to get a good visualization of the skeletal remains of the baby. Dr. Kohler reiterated that Jessie's body was in an advanced stage of putrefaction with the drying out of the skin and the exposure of bones. She

explained certain conditions affected the speed at which putrefaction occurs. Those conditions include a hot environment and exposure which would allow insects access to the body. As a result of her external autopsy, Dr. Kohler was unable to observe any external signs of recent injury. She further testified that dental records were used to positively identify the body as that of Davis.

{¶ 29} Dr. Kohler examined the bones to look for injuries. However, the medical examiners from her office were not able to recover all of the bones despite searching the scene a second time. Dr. Kohler called in forensic anthropologists to assist her in the examination of the bones. The examination did not identify any injuries to the bones which had been recovered. Toxicology tests were also performed on some of the remaining internal organ tissues, as no fluid remained in the body. The results of these tests showed there were no detected drugs in the tissue. Dr. Kohler ruled the death as unspecified homicidal violence. Dr. Kohler explained:

{¶ 30} "What that indicates is the circumstances around her disappearance and her discovery and evidence obtained during the investigation indicate that Ms. Davis had come to harm at the hands of another individual.

{¶ 31} "Because of the stage of decomposition and putrefaction of the tissues, I could no longer identify what type of injury had resulted in her death, but the fact that she is found some great distance from her home wrapped in bedding and left out in the open field is evidence that that [sic] there was homicidal intent here. A natural death would not occur under those circumstances. Suicide would not be an issue in this situation. And based on circumstances an accident was also ruled out. Therefore, it would be a homicidal death. Unfortunately, I am unable to say exactly how the death occurred." (Feb. 8, 2008, T. at 1276).

{¶ 32} Dr. Kohler explained it is possible to asphyxiate a person using one's arm, either by placing the forearm against the front of the victim's neck, or placing the victim's neck in the crook of the arm and applying pressure on either side. Dr. Kohler stated that the condition of Jessie's body prevented a determination of whether she had been manually strangled. The condition of the body also impeded Dr. Kohler's ability to make any findings as to whether Davis had been stabbed or shot. Dr. Kohler found no trauma to the fetus, and opined the fetus died as a result of maternal death. Dr. Kohler added Davis was thirty-seven weeks pregnant and the fetus was viable on June 14, 2007.

{¶ 33} Upon conclusion of Dr. Kohler's testimony, the State rested its case. At that time, Appellant made an oral Crim.R. 29 Motion for Acquittal. After the parties argued their respective positions, the trial court overruled the motion.

{¶ 34} During the defense's case, Appellant testified on his own behalf. Appellant recalled that he met Davis at a nightclub in late February or early March, 2004, when Appellant was separated from his wife. He recalled that he and Davis had

sexual relations that night and that sometime later in the year, he learned that she was pregnant with Blake, who was born on December 3, 2004.

{¶ 35} Appellant stated that he and his wife Kelly reconciled in early September, 2004. He stated that paternity for Blake was established in April, 2005, and that thereafter he began giving Davis child support and visiting Blake on a weekly basis. When asked about the incidents involving Davis and his wife, Appellant stated that he never confronted Davis because "there was nothing going on" between him and Davis at that time. Appellant acknowledged he and Davis became intimate again in 2005, after he and his wife separated again. He stated that in early November, 2006, he and Davis engaged in sexual relations at a time when Appellant and his wife "had some issues." Appellant subsequently learned that Davis was pregnant again after Davis contacted his wife and told her. Appellant testified that his wife moved out in February, 2007. Appellant continued to see Davis because of visitation with Blake, however, he claimed the two were not intimate.

{¶ 36} During his testimony, Appellant adamantly denied making the statement to Richard Mitchell that he should kill Davis and throw her body in the woods. Appellant also testified that while he and Mitchell were friendly, Mitchell was not his best friend.

{¶ 37} Appellant went on to testify that on June 10, 2007, he received a couple of text messages from Davis asking him if he was at work and telling him that she thought she might be in labor and might need him to watch Blake. Appellant stated that he told Davis he would take care of Blake while she went to the hospital. Appellant also recalled he and Davis discussed when he could watch Blake during the week of June 11, 2007. Appellant says he told Davis he could watch Blake on Thursday, his day off. Appellant stated that afterwards, he remembered that football practice was starting that week so he made arrangements with his friend, Myisha Ferrell, to watch Blake on that day. Appellant explained that Ferrell had asked him if she could borrow $100.00. Appellant says he offered to pay her $20.00 for watching Blake and loan her $80.00, which she would have to pay back.

{¶ 38} Appellant next testified to his actions on June 13, 2007. Appellant stated he had worked the previous night, with his shift ending at 8:00 a.m. on June 13, 2007. He then described what he did throughout the course of his day, prior to attending a softball game which started at 6:30 p.m. Appellant stated he spoke with Davis on his way to the softball game and informed her he planned on picking up Blake that evening around 10:00 p.m. He says that he and some other teammates stayed after their softball game was over and watched the second game of the evening. Appellant says he telephoned Davis and told her he was going to Champs Bar after the game and if he had anything to drink, he would not pick up Blake that evening, but would get him the next morning by 6:00 a.m. Appellant says he then proceeded to Champs Bar where he drank four or five beers and

socialized with friends, including Denise Haidet, leaving at approximately 1:00 a.m. Appellant stated he then drove to Stephanie Hawthorne's house, where he stayed until 2:00 a.m. before heading home. Appellant recalled that he spoke with Hawthorne on his cell phone on his way home.

{¶ 39} Appellant testified that he woke up at 5:20 a.m. on June 14, 2007, and drove to Jessie's house, arriving at approximately 5:45 a.m. Appellant stated he entered the home through the garage, which Davis would leave open when she was expecting him to come for Blake. Appellant says he knocked on the door, entered the house and called for Davis, who responded from upstairs. Appellant says he went upstairs, found Davis on the floor in her bedroom, and asked her what was wrong and if she was in labor. Appellant says Davis told him she was tired and nauseous. Appellant says he then asked her to get Blake ready and when Davis did not promptly get up, he again asked her to hurry up. Appellant stated that when she still did not respond quickly, he helped her get to her feet. Appellant admitted that he could tell Davis was trying to get her bearings once she was on her feet, but he still pushed her to hurry up as he wanted to get home and get more sleep. Appellant testified that Davis rebuked him, stating "If you weren't out last night with your friends all night, you wouldn't be rushing me now." (February 11, 2008, T. at 201). Appellant recalled he responded that what he did was not her concern, and he did not have to be there and could instead get Blake over the weekend. Appellant stated he then attempted to leave, but Davis stepped in front of him and grabbed his shirt. Appellant said he pulled away and tried to step around Davis, but she again moved in front of him. Appellant testified that Davis then grabbed him, telling him he could not leave because she needed to go to work. Appellant said he replied that he could leave if he could get her out of his way. Appellant stated he then pretended to stick his finger up his nose and put it in her face, and that Jessie bit his finger. Appellant said he looked at his finger and told Davis he was "definitely leaving now, I don't care if you have to work or not." *Id.* at 205.

{¶ 40} Appellant testified he next stepped around Davis and she grabbed him and told him he could not leave. He stated that in an attempt to free himself from Jessie's grasp, he pulled his arm away and threw back his elbow, which struck Davis in the throat area. Appellant stated he was heading toward the door when he heard Davis fall, and he turned around and saw her lying on the floor. He testified that he went over to her and asked if she was all right, but she did not respond. Appellant says that he shook Jessie's shoulders and again asked her if she was all right but she remained unresponsive. Appellant testified that he unsuccessfully attempted CPR but was unable to find a pulse. Appellant went on to testify that he saw a bottle of bleach, and that he poured some into the cap and placed it under Jessie's nose in an attempt to revive her. Appellant explained that he knocked over the bleach bottle when he stood up. Appellant offered that he did not call 911 because he was unable to turn on Jessie's cell phone, which he located in its charger. Appellant acknowledged that he had his two cell phones in his truck but did not think about getting one from the vehicle to call 911. Appellant says he

then collapsed, crying and fell back onto Jessie's bed, pushing the mattress off the box spring. Appellant claims he decided to leave without seeking help, because he knew he would never be able to explain what had occurred. He says that he checked on Blake and, finding him asleep, decided to leave him there while he went to get Ferrell to watch him. Appellant testified he then decided to take Jessie's body with him, placing her in the bed of his truck.

{¶ 41} Appellant says that when he arrived at Ferrell's house he told her that he needed her to come with him immediately. Appellant claims he intended to return to Jessie's house and have Ferrell watch Blake while he went to the police to explain the situation. Instead, he said that as the two were driving north on Interstate 77, he realized he was going to have a difficult time explaining why he moved Jessie's body. Appellant stated that he passed the exit for Jessie's house and continued to drive north. Appellant admitted that at approximately 7:10 a.m., he called Jessie's phone, but says he could not explain why he did so. Appellant said he exited the highway with the intention of returning to Jessie's house. Appellant recalled that he stopped at a rest area in order for Ferrell to use the restroom. Appellant recalled that he next traveled back onto the highway, but a state trooper passed them and he panicked and again exited the highway. He claims he then decided to travel back to Canton on back roads. Appellant testified he did not know where he was and drove around for at least a half an hour looking for a familiar landmark, eventually turning onto a dirt road into a park, where he made the decision to leave Jessie's body there.

{¶ 42} Appellant went on to testify that after leaving the park, he instructed Ferrell to throw Jessie's phone out the window because he could not get the phone to work and he did not need it. Appellant stated that Ferrell told him she needed cigarettes, so he stopped at a convenience store which had a carwash. Appellant explained that he decided to wash the car because his windshield wiper fluid would not work and there were bugs all over the windshield. Appellant recalled that prior to getting back on the highway, he deposited a garbage bag of trash, as well as a pillow from Jessie's bed into a dumpster.

{¶ 43} Appellant went on to explain that he continued with a normal daily routine, thinking the whole situation would go away. Appellant stated that he contacted the head football coach to tell him he would be late for practice, then stopped and picked up bags of mulch because he and his daughter had planned to mulch the flower beds at his house that day. Appellant says that he went back to his house, took a shower and continued with his schedule for the day. Appellant acknowledged he did not even think about Blake, as he just wanted the whole situation to go away. Appellant recalled that after football practice, he signed papers for a bank loan and then picked up his daughter. He returned to his house and picked up Ferrell to take her home. Appellant recalled that he stopped at Wal-Mart to buy his daughter a snow-cone maker and later that evening coached basketball.

{¶ 44} Appellant worked the 10:00 p.m. to 8:00 a.m. shift, and says that he planned to leave early to pick up Blake. He testified that he left the station at 7:45 a.m. on June 15, 2007, and was heading toward Jessie's house. He then received a call from Jessie's sister, telling him that Jessie was missing. Appellant says that he arrived at Jessie's house and was relieved to find Blake was safe. Although Appellant knew what had happened, he stated that he was unable to explain what occurred to the authorities because he feared they would not believe him. Appellant testified that it was sometime during the middle of the following week that he decided he had to end the charade because Jessie's family and his family had been through so much. On Saturday, June 23, 2007, Appellant and his attorney proceeded to the FBI office where Appellant disclosed the general location of Jessie's body. Appellant ultimately led authorities to that location.

{¶ 45} On cross-examination, the State elicited testimony from Appellant regarding his financial situation, including the increase in child support which would occur with the birth of Jessie's baby and from any obligation resulting from his divorce. Appellant admitted he applied for and received a loan, and that he paid approximately $2800 a month for various debts. The State also inquired of Appellant as to his actions on the morning of June 14, 2007. When asked why he did not get Blake ready instead of hurrying Davis, Appellant explained they had a routine and she was the one who would get Blake ready while he put the car seat in his truck. Appellant acknowledged after Davis fell, he did not retrieve his own cell phone out of his truck in order to call 911 when he was unable to turn on Jessie's phone. Appellant also conceded his attempts at CPR only lasted a few minutes. Appellant stated his actions following Jessie's death and the disposal of the body were an attempt to maintain a sense of normalcy in the hopes that what had happened actually had not happened. Appellant could not explain why he continued to conceal the whereabouts of Davis during the week following her disappearance.

{¶ 46} The defense rested its case following Appellant's testimony. Appellant renewed his Crim.R. 29 Motion for Acquittal and, during discussion of the jury instructions, requested the trial court instruct the jury on the lesser-included offense of involuntary manslaughter for counts one and two. The trial court denied this request.

{¶ 47} After hearing all the evidence and deliberations, the jury found Appellant not guilty of aggravated murder as alleged in Count 1 of the Indictment, but guilty of the lesser-included offense of murder. The jury also found Appellant guilty of the remaining charges and specifications. The trial court scheduled a separate mitigation phase of the trial. At the conclusion of this hearing, the jury recommended Appellant be sentenced to life in prison with parole eligibility after serving thirty years for the two aggravated murder convictions relative to the death of Davis's unborn child. The trial court accepted the jury's recommendation for the two counts of aggravated murder but merged the offenses for purposes of

14

sentencing. The trial court sentenced Appellant to an aggregate term of imprisonment of fifty-seven years to life.

Exhibit 52, ¶¶1-47.

## II. Procedural Background

### A. State Conviction

#### 1. Indictment

On August 23, 2007, the Stark County Grand Jury indicted Cutts on seven counts involving the homicide of Jessie Marie Davis ("Davis") and her unborn child.  Exhibit 1.  Cutts was charged with one count of aggravated murder in the death of Davis, in violation of R.C. § 2903.01(B), with two death penalty specifications ("Count One"); one count of aggravated murder for the unlawful termination of Davis's pregnancy, in violation of R.C. § 2903.01(B), with three death penalty specifications ("Count Two"); one count of aggravated murder of the viable, unborn child of Davis a.k.a. Baby Chloe, in violation of R.C. § 2903.01(C), with three death penalty specifications ("Count Three"); one count of aggravated burglary, in violation of R.C. § 2911.11(A)(1) ("Count Four"); two counts of gross abuse of a corpse, in violation of § 2927.01(B) ("Counts Five and Six"); and one count of child endangering in regard to his son, Blake Davis, in violation of R.C. § 2919.22(A) ("Count Seven").  Exhibit 1.  Cutts plead not guilty to the indictment.  Exhibit 52, ¶1.

#### 2. Pre-trial Motions and Orders

Prior to trial, Cutts filed numerous pre-trial motions and requests for relief.[4]  The State filed responses to Cutts's motions.[5]  The trial court denied the following motions: motion in

---

[4] Exhibit 2 (motion in limine to prohibit victim-impact evidence during trial and, if necessary, during sentencing); Exhibit 3 (motion in limine to prohibit the prejudicial display of tangible things during trial); Exhibit 4 (motion for individual sequestered voir dire on death penalty, publicity, and other issues); Exhibit 5 (motion to exclude any evidence relating to other crimes, wrongs or acts); Exhibit 6 (motion for special procedures to insulate the venire and the empanelled jury); Exhibit 7 (authority for defendant's requested jury instructions: culpability phase); Exhibit 19 (renewed motion to reduce bias in the annual jury list by adding names of licensed drivers in Stark County); Exhibit

limine to prohibit victim-impact evidence during trial and, if necessary, during sentencing (Exhibit 13); motion to prohibit the prejudicial display of tangible things during trial (Exhibit 14); motion to exclude any evidence relating to other crimes, wrongs or acts (Exhibit 18); renewed motion to reduce bias in the annual jury list by adding names of licensed drivers in the county (Exhibit 21); motion to dismiss the death penalty specification, finding the indictment provided adequate notice and that the death penalty was constitutional (Exhibit 31); motion to dismiss the aggravated murder indictment specifications relating to the death of two or more persons (Exhibit 37);[6] motion in limine to quash opinion testimony of police officers and witnesses (Exhibit 39); motion in limine to prohibit the State from offering the testimony of Stephanie Hawthorne, Jill Butler and Todd Porter (Exhibit 42, Exhibit 43);[7] and motion to change venue (Exhibit 44).

---

22 (motion to dismiss the death penalty specifications as violating the 5th, 6th, 8th and 14th Amendments to the United States Constitution and Ohio Constitution); Exhibit 23 (motion in limine to quash the use of opinion testimony of the police and witnesses); Exhibit 24 (request for an order to allow removal of his shackles while in the attorney interview room at the Stark County jail); Exhibit 25 (proposed additions to the pre-publicity jury questionnaire); Exhibit 35 (motion to dismiss the aggravated murder indictment specifications relating to the death of two or more persons); Exhibit 38 (motion to change venue due to extensive news coverage of the case and the accusations as to the nature of his involvement in the alleged crimes); and Exhibit 40 (motion in limine to prohibit the State from offering testimony of three witnesses: two former girlfriends, Stephanie Hawthorne and Jill Butler, and Todd Porter, a reporter for the Canton Repository who interviewed Cutts in June 2007 prior to the indictment).

[5] Exhibit 8 (response to motion in limine regarding victim-impact evidence); Exhibit 9 (response to motion for individual sequestered voir dire); Exhibit 10 (response to motion to exclude evidence relating to other crimes); Exhibit 11 (response to motion for special procedures to insulate the venire); Exhibit 12 (response to motion in limine to prohibit the prejudicial display of tangible things); Exhibit 20 (response to renewed motion to reduce bias in the annual jury list); Exhibit 26 (response to motion to dismiss death penalty specifications); Exhibit 27 (response to request for order to allow removal of shackles); Exhibit 28 (response to proposed additions to pre-trial publicity questionnaire); Exhibit 32 (response to motion in limine to quash the use of opinion testimony); Exhibit 36 (response to motion to dismiss the aggravated murder indictment specifications relating to the death of two or more persons); and Exhibit 41 (response to motion to prohibit the State from offering the testimony of Stephanie Hawthorne, Jill Butler and Todd Porter).

[6] In denying Cutts's motion to dismiss the aggravated murder indictment specifications relating to the death of two or more persons, the trial court indicated that "the expansive definition of 'person' under R.C. § 2901.01(B)(1)(a)(ii) which includes 'an unborn human who is viable' is applicable to the specifications set forth in R.C. § 2929.04(A)(5) and (A)(9)." Exhibit 37, p.1.

[7] By separate entry, the trial court granted in part and, denied in part, a motion to quash subpoena to Todd Porter and to limit testimony of Todd Porter. Exhibit 43, Exhibit 58 (Transcript of 2-1-2008 Motions Hearing, pp. 87-103).

The trial court granted, in part, Cutts's motion for individual sequestered voir dire on

death penalty, publicity, and other issues.  Exhibit 15.  The trial court ordered individual voir dire

for death penalty qualification, pretrial publicity and specific items personal in nature to a

prospective juror with the balance of the jury questioning to be done collectively.  Exhibit 15.

Based on the State's and Cutts's agreement to certain of the proposals contained in Cutts's

motion for special procedures to insulate the venire and the empanelled jury, the trial court

granted, in part, that motion.  Exhibit 16.  The trial court also granted, in part, Cutts's proposed

additions to the pre-trial publicity jury questionnaire.  Exhibit 29.  The trial continued a ruling

on Cutts's request for removal of his shackles while in the attorney interview room pending an

attempt by counsel to reach a compromise as to Cutts's request.  Exhibit 30.

On January 10, 2008, the trial court filed the agreed pre-publicity questionnaire for

potential jurors (Exhibit 33) and, on January 31, 2008, the trial court issued an order sealing the

pre-trial publicity and death penalty questionnaires (Exhibit 34).

### 3.  Jury Trial and Sentencing

The jury trial began on February 4, 2008. Exhibit 48, p. 2.  Ultimately, the jury rendered

verdicts of guilty.  Exhibits 45, 46.  The jury found Cutts guilty on the lesser included offense of

murder (Count One), two counts of aggravated murder, each with all three specifications (Counts

Two and Three), aggravated burglary (Count Four), two counts of abuse of a corpse (Counts

Five and Six), and child endangering (Count Seven).  Exhibits 45, 46.  On February 27, 2008, the

jury returned its verdict in the mitigation phase as to Count Two (aggravated murder involving

the unlawful termination of Davis's pregnancy) and Count Three (aggravated murder of the

unborn human of Davis) and recommended life imprisonment with parole eligibility after thirty

years.  Exhibit 48, pp. 3-4.   The trial court accepted and announced the verdicts in open court

and discharged the jury. Exhibit 48, p. 4. Thereafter the trial court proceeded with sentencing and, after merging Count Three into Count Two for sentencing purposes, the trial court sentenced Cutts to a total term of fifty-seven years to life imprisonment, with a mandatory period of post release control of five years.[8] Exhibit 48, pp. 4-7.

## B. Direct Appeal

On April 11, 2008, Cutts filed a Notice of Appeal to the Fifth District Court of Appeals of his conviction and sentence entered on March 12, 2008. Exhibit 49. In his Brief, he presented thirteen assignments of error:

> **First Assignment of Error**: The Trial Court erred in failing to instruct the Jury on the lesser included charge of Involuntary Manslaughter.
>
> **Second Assignment of Error**: The Trial Court erred in its denial of Defendant's Request for Mistrial and its failure to find that the Jury's verdict was inconsistent as a matter of law.
>
> **Third Assignment of Error**: The Trial Court erred in denying Defendant's Motion for Change of Venue.
>
> **Fourth Assignment of Error**: The Trial Court erred in denying Defendant's Motion for Acquittal.
>
> **Fifth Assignment of Error**: Appellant's convictions are against the manifest weight and sufficiency of the evidence.
>
> **Sixth Assignment of Error**: The Trial Court erred in denying Defendant's Motion to Expand the Prospective jury venire through the use of driver's license records.
>
> **Seventh Assignment of Error**: The Trial Court erred in denying Defendant's Motion in Limine with regard to hearsay statements made by Blake.
>
> **Eighth Assignment of Error**: The Trial Court erred in denying Defendant's Motion to Disclose Grand Jury Testimony.

---

[8] Fifteen years to life on the charge of murder; life imprisonment with parole eligibility after serving thirty years on the charge of aggravated murder; ten years on the charge of aggravated burglary; one year on each count of gross abuse of a corpse; six months on the charge of endangering children with Counts One, Two, Four, Five and Six consecutively, but concurrent with Count Seven for a total of fifty-seven years to life imprisonment. Exhibit 48, pp. 4-7.

**Ninth Assignment of Error**:  The Trial Court erred in denying Defendant's Motion in Limine as to Introduction of Testimony that is Prejudicial Pursuant to Evidence Rule 403.

**Tenth Assignment of Error**:  The Trial Court erred in denying Defendant's Motion to Dismiss the Capital Specifications of the Indictment.

**Eleventh Assignment of Error**:  The Trial Court committed a reversible error by sentencing defendant to maximum and consecutive sentences on all of the counts and by failing to make a finding that the charges of murder, aggravated murder and aggravated burglary are allied offenses which should be merged and served concurrent to each other.

**Twelfth Assignment of Error**:  The Trial Court erred in refusing to remove prospective Jurors who participated in the search for the victim Jesse Davis for cause.

**Thirteenth Assignment of Error**: The Trial was tainted by systematic prejudice and prosecutorial misconduct.

Exhibit 50.  On January 13, 2009, the State filed a responsive brief.  Exhibit 51.  On July 22, 2009, the Fifth District Court of Appeals issued its opinion affirming the judgment of the trial court.  Exhibit 52.

On September 8, 2009, Cutts filed a Notice of Appeal with the Ohio Supreme Court (Exhibit 53) and a Memorandum in Support of Jurisdiction wherein he presented the following nine propositions of law (Exhibit 54):

**Proposition of Law No. I**: When the evidence presented could lead the jury to find that the deaths were not intentionally caused, failure to instruct on the lesser included charge of Involuntary Manslaughter is error.

**Proposition of Law No. II**:  The jury's verdicts were inconsistent since one act and a single animus resulted in both the death of Davis and the unborn child. Thus, the evidence was insufficient to support the different verdicts as a matter of law, not supported by the greater weight and acquittals should have been entered.

**Proposition of Law No. III**:  The charges are allied offenses which should be merged and served concurrently.  Therefore, the maximum sentences must be reversed.

**Proposition of Law No. IV**:  An accused is entitled to a change of venue when it was clearly evident that the jury here has been so exposed by pre-trial publicity to this case that the panel had detailed knowledge of the case.

**Proposition of Law No. V**:  A juror who participated in the search of the victim should have been excused for cause as a matter of law.

**Proposition of Law No. VI**:  Grand jury testimony must be disclosed when a particularized need for disclosure is shown.

**Proposition of Law No. VII**:  Driver's license records should have been used to expand the jury pool and ensure diversity.

**Proposition of Law No. VIII**:  The trial court allowed testimony that was unreliable and highly prejudicial including out of court statements allegedly made by the two-year old son.

**Proposition of Law No. IX**:  The Capital specifications were not factually supported by the evidence.

Exhibit 54.  On October 8, 2009, the State filed its responsive Brief.  Exhibit 55.  On December 2, 2009, the Ohio Supreme Court declined jurisdiction to hear Cutts's case and dismissed the appeal as one not involving any substantial constitutional question.  Exhibit 56.

On March 2, 2010, Cutts filed a Petition for Writ of Certiorari with the United States Supreme Court.  Exhibit 57.  On May 17, 2010, Cutts's Petition for Writ of Certiorari was denied.  Exhibit 57.

**C.  Federal Habeas Corpus Petition**

On May 17, 2011, Cutts filed his petition for writ of habeas corpus ("Petition").  Doc. 1. In his Petition, Cutts asserts the following ten grounds for relief:

**Ground One:**  The jury's verdicts were inconsistent since one act and a single animus resulted in both the death of Davis and the unborn fetus. Thus, the evidence was insufficient to support the different verdicts as a matter of law, thus a judgment of acquittal should have been entered for the petitioner.

**Ground Two**:  An accused is entitled to a change of venue when it was clearly evident that the jury had been so exposed by pre-trial publicity that the jury had detailed knowledge of the case.

**Ground Three**:  A juror who participated in the search of the victim should have been excused for cause, as a matter of law and thus petitioner's sixth amendment right to a fair and impartial jury was violated.

**Ground Four**:  Where there was uncontroverted evidence presented by the defense that the deaths were not intentionally caused it is a due process violation when the trial court failed to instruct the jury on the lesser included offense of involuntary manslaughter.

**Ground Five**:  An alternative method of using Ohio driver's license records to expand the prospective jury venire should have been utilized to ensure a jury composed of a fair cross-section of the community as guaranteed by the sixth and fourteenth amendments.

**Ground Six**:  A request for grand jury testimony should be granted when there is a particularized need demonstrated by the petitioner, and a denial of such is a violation of due process.

**Ground Seven**:  The admission of the out-of-court hearsay statements purportedly made by a two (2) year old child violated the Petitioner's right of confrontation under the sixth amendment.

**Ground Eight**:  The State's repeated use of character evidence that was irrelevant and inflammatory, denied the Petitioner's right to a fair trial.

**Ground Nine**:  It is a violation of due process when a trial court imposes maximum and consecutive sentences when the convictions are allied offenses and should be merged for sentencing purposes.

**Ground Ten**:  The trial court's failure to dismiss the capital specifications to the indictment was a violation of his right to due process.

Doc. 1, pp. 8-10, 20-41.

### III. Procedural Barriers to Review and Mootness

### A.  Summary of procedural default and mootness determinations

Respondent argues that Grounds One, Four, Seven and Eight are unexhausted and/or

procedurally defaulted and therefore barred from federal habeas review.  Additionally,

Respondent argues that Ground Ten is moot.

For the reasons explained below, the undersigned concludes that Petitioner has procedurally defaulted the portion of Ground One that relies upon the argument that the verdicts were inconsistent and therefore the evidence was insufficient to convict, i.e., his argument that "the jury's findings on the Counts dealing with the deaths of the mother and the unborn fetus were inconsistent based on the evidence presented." Doc. 1, pp. 20-22. Petitioner has not procedurally defaulted the second portion of his sufficiency of evidence claim in Ground One, i.e. his argument that "the convictions of Murder, Aggravated Murder and Aggravated Burglary were against both the weight and sufficiency of the evidence." Doc. 1, pp. 22-23. That sufficiency of evidence claim will be addressed on the merits in Section IV.B.1 below.[9]

Also, for the reasons explained below, the undersigned concludes that the entirety of Grounds Four, Seven and Eight are procedurally defaulted and Ground Ten is moot.

### B.  Procedural Default and Exhaustion Analysis

A petitioner must meet certain procedural requirements in order to have his claims reviewed in federal court. *Smith v. Ohio Dep't of Rehab. & Corr.,* 463 F.3d 426, 430 (6th Cir. 2006). "Procedural barriers, such as statutes of limitations and rules concerning procedural default and exhaustion of remedies, operate to limit access to review on the merits of a constitutional claim." *Daniels v. United States,* 532 U.S. 374, 381 (2001). Although procedural default is sometimes confused with exhaustion, exhaustion and procedural default are distinct concepts. *Williams v. Anderson,* 460 F.3d 789, 806 (6th Cir. 2006). Failure to exhaust applies where state remedies are "still available at the time of the federal petition." *Id.* at 806 (quoting

---

[9] To the extent that Petitioner has attempted to assert a manifest weight of the evidence as part of Ground One, that claim is not cognizable in federal habeas review. *Brown v. Moore,* 2008 WL 4239160, *8 (S.D. Ohio 2008) (citing 28 U.S.C. § 2254(a); *Pulley v. Harris,* 465 U.S. 37, 41 (1998)) ("[a] 'manifest weight of evidence' claim, which is based on a state law concept that 'is both quantitatively and qualitatively different' from a constitutional due process sufficiency of evidence standard, raises an issue of state law only.").

*Engle v. Isaac*, 456 U.S. 107, 125 n.28 (1982)).  In contrast, where state court remedies are no longer available, procedural default rather than exhaustion applies.  *Williams*, 460 F.3d at 806.

**Exhaustion.**  A federal court may not grant a writ of habeas corpus unless the petitioner has exhausted all available remedies in state court.  28 U.S.C. § 2254(b)(1)(A).  A state defendant with federal constitutional claims must fairly present those claims to the state courts before raising them in a federal habeas corpus action.  28 U.S.C. § 2254(b), (c); *Anderson v. Harless*, 459 U.S. 4, 6  (1982) (per curiam); *Picard v. Connor*, 404 U.S. 270, 275–76 (1971); *see also Fulcher v. Motley*, 444 F.3d 791, 798 (6th Cir. 2006) (quoting *Newton v. Million*, 349 F.3d 873, 877 (6th Cir. 2003)) ("[f]ederal courts do not have jurisdiction to consider a claim in a habeas petition that was not 'fairly presented' to the state courts").  A constitutional claim for relief must be presented to the state's highest court in order to satisfy the fair presentation requirement.  *See O'Sullivan v. Boerckel*, 526 U.S. 838, 845-48 (1999); *Hafley v. Sowders*, 902 F.2d 480, 483 (6th Cir. 1990).

In order to satisfy the fair presentation requirement, a habeas petitioner must present both the factual and legal underpinnings of his claims to the state courts.  *McMeans v. Brigano*, 228 F.3d 674, 681 (6th Cir. 2000).  This means that the petitioner must present his claims to the state courts as federal constitutional issues and not merely as issues arising under state law.  *See, e.g.*, *Franklin v. Rose*, 811 F.2d 322, 325 (6th Cir. 1987); *Prather v. Rees*, 822 F.2d 1418, 1421 (6th Cir. 1987).  In determining whether a petitioner presented his claim in such a way as to alert the state courts to its federal nature, a federal habeas court should consider whether the petitioner: (1) relied on federal cases employing constitutional analysis; (2) relied on state cases employing constitutional analysis; (3) phrased the claim in terms of constitutional law or in terms

sufficiently particular to allege a denial of a specific constitutional right; or (4) alleged facts well within the mainstream of constitutional law. *McMeans,* 228 F.3d at 681.

**_Procedural Default._**  Procedural default may occur in two ways.  *Williams*, 460 F.3d at 806.  First, a petitioner procedurally defaults a claim if he fails "to comply with state procedural rules in presenting his claim to the appropriate state court." *Id.*  In *Maupin v. Smith,* 785 F.2d 135, 138 (6th Cir. 1986), the Sixth Circuit provided four prongs of analysis to be used when determining whether a claim is barred on habeas corpus review due to petitioner's failure to comply with a state procedural rule: (1) whether there is a state procedural rule applicable to petitioner's claim and whether petitioner failed to comply with that rule; (2) whether the state court enforced the procedural rule; (3) whether the state procedural rule is an adequate and independent state ground on which the state can foreclose review of the federal constitutional claim and (4) whether the petitioner can demonstrate cause for his failure to follow the rule and that he was actually prejudiced by the alleged constitutional error. *See also Williams*, 460 F.3d at 806 ("If, due to the petitioner's failure to comply with the procedural rule, the state court declines to reach the merits of the issue, and the state procedural rule is an independent and adequate grounds for precluding relief, the claim is procedurally defaulted.") (citing *Maupin*, 785 F.2d at 138).

Second, "a petitioner may procedurally default a claim by failing to raise a claim in state court, and pursue that claim through the state's 'ordinary appellate review procedures.'" *Williams*, 460 F.3d at 806 (citing *O'Sullivan*, 526 U.S. at 848).  "If, at the time of the federal habeas petition, state law no longer allows the petitioner to raise the claim, the claim is procedurally defaulted." *Williams*, 460 F.3d at 806.  While the exhaustion requirement is technically satisfied because there are no longer any state remedies available to the petitioner,

see *Coleman v. Thompson,* 501 U.S. 722, 732 (1991), the petitioner's failure to have the federal claims considered in the state courts constitutes a procedural default of those claims that bars federal court review.  *Williams,* 460 F.3d at 806.

       To overcome a procedural bar, a petitioner must show cause for the default and actual prejudice that resulted from the alleged violation of federal law or that there will be a fundamental miscarriage of justice if the claims are not considered.  *Coleman*, 501 U.S. at 750.

### 1.      A portion of Ground One is procedurally defaulted

       In Ground One, Cutts asserts: "The jury's verdicts were inconsistent since one act and a single animus resulted in both the deaths of Davis and the unborn fetus.  Thus, the evidence was insufficient to support the different verdicts as a matter of law, thus a judgment of acquittal should have been entered for the Petitioner."  Doc. 1, p. 20.  His arguments relative to Ground One are twofold: (1) "the jury's findings on the Counts dealing with the deaths of the mother and the unborn fetus were inconsistent based on the evidence presented[;]" (Doc. 1, pp. 20-22) and (2) "the convictions of Murder, Aggravated Murder and Aggravated Burglary were against both the weight and sufficiency of the evidence."  (Doc. 1, pp. 22-23).   As discussed more fully below, Petitioner has procedurally defaulted that portion of Ground One that relies upon the argument that the verdicts were inconsistent and therefore the evidence was insufficient to convict, i.e., his argument that "the jury's findings on the Counts dealing with the deaths of the mother and the unborn fetus were inconsistent based on the evidence presented."  Doc. 1, pp. 20-22.

       Respondent argues that Petitioner has procedurally defaulted Ground One because he did not fairly present Ground One to the state court of appeals in the same manner as he has

presented it to this Court.[10] Doc. 8, pp. 38-39. Respondent asserts that Petitioner "appears to have combined his two claims of error, error requiring mistrial and error requiring acquittal, as one claim and thus has failed to make a cogent claim at all." Doc. 8, pp. 42-43.

In response to Respondent's procedural default argument, Petitioner contends that his Ground One claims were presented to the state court of appeals in his *fourth and fifth assignments of error*. Doc. 12, p. 3. Petitioner's fourth assignment of error claimed that "the trial court erred in denying defendant's motion for acquittal" (Exhibit 50, pp. 16-18), and Petitioner's fifth assignment of error claimed that "appellant's convictions are against the manifest weight and sufficiency of the evidence" (Exhibit 50, pp. 18-24). Petitioner does not indicate where within his fourth and fifth assignments of error he specifically asserted that inconsistent verdicts amount to insufficient evidence such that the state appellate court would be alerted to the claim the he now presents to this Court, i.e., that inconsistent verdicts amount to insufficient evidence.[11]

Since Cutts has not demonstrated that he fairly presented his claim of insufficiency of the evidence to the state court of appeals in the same manner that he now presents that claim, i.e., that inconsistent verdicts amount to insufficient evidence, and because Cutts does not claim nor

---

[10] Respondent also argues that Cutts's claim in Ground One was not presented to the Ohio Court of Appeals in the same manner that he later presented it to the Ohio Supreme Court. Doc. 8, p. 46.

[11] Giving the Petitioner the benefit of the doubt, the undersigned notes that, as part of his fifth assignment of error, Petitioner argued that, "[m]ost troubling is the jury's finding of not guilty as to the charge of aggravated murder for Ms. Davis and the subsequent finding of guilt on counts 2 and 3 relating to the death of unborn fetus." Exhibit 50, p. 24. To the extent that this argument constitutes fair presentation of a claim of inconsistent verdicts, this specific argument was made in connection with the manifest weight of the evidence portion of his fifth assignment of error, not the sufficiency of the evidence portion, and Petitioner has not clearly presented a manifest weight of the evidence claim and thus such a claim is waived. *See McPherson v. Kelsey*, 125 F.3d 989, 996 (6th Cir. 1997) ("Issues adverted in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived.") (citations omitted). Moreover, as previously indicated, to the extent that Petitioner has attempted to assert a manifest weight of the evidence argument as part of Ground One, such a claim is not cognizable in federal habeas review. *Brown*, 2008 WL 4239160 at *8 (citing 28 U.S.C. § 2254(a); *Pulley*, 465 at 41) ("[a] 'manifest weight of evidence' claim, which is based on a state law concept that 'is both quantitatively and qualitatively different' from a constitutional due process sufficiency of evidence standard, raises an issue of state law only.")

can he show that state court remedies remain available to him to now raise his constitutional claim, that portion of Ground One is procedurally defaulted unless he can overcome the default. *Williams*, 460 F.3d at 806; *McMeans*, 228 F.3d at 681 (a habeas petitioner must present both the factual and legal underpinnings of his claims to the state courts).

To overcome this procedural bar, Cutts must show cause for the default and actual prejudice that resulted from the alleged violation of federal law or must show that there will be a fundamental miscarriage of justice if the claims are not considered.  *Coleman*, 501 U.S. at 750. As "cause" for his procedural default, Petitioner asserts that the Ohio Supreme Court's restrictive 15 page limit for its Briefs required him to streamline his arguments before that court.  Doc. 12, pp. 4-5.  He thus argues that he was unable to fairly present his claims in the same manner to the state court of appeals, the Ohio Supreme Court, and this Court.  Doc. 12, pp. 4-5.  Since Petitioner's procedural default is based on the fact that he did not fairly present his claim that inconsistent verdicts amount to insufficient evidence to the state *court of appeals*, not the *Ohio Supreme Court*, Petitioner's reliance upon page limitations in the *Ohio Supreme Court* is insufficient to overcome his procedural default.  Further, Petitioner fails to present this Court with legal authority to support his alleged "cause."

Based on the foregoing, the undersigned concludes that Petitioner has procedurally defaulted the portion of Ground One that includes a claim that inconsistent verdicts amount to insufficient evidence and has failed to demonstrate cause for the procedural default.  Moreover, even if not procedurally defaulted, Petitioner has failed to demonstrate that a claim of insufficient evidence that is based on allegedly inconsistent verdict constitutes a federally cognizable claim.  *See e.g.*, *Russell v. Anderson*, 2008 WL 4534144, *3 (N.D. Ohio Oct. 6, 2008) (questioning whether a claim based on inconsistent verdicts is a federally cognizable claim and

noting that "[t]he Sixth Circuit has held that inconsistency in verdicts is not a sufficient reason for reversal) (internal citations omitted).  The undersigned further concludes that Petitioner has not procedurally defaulted the second portion of Ground One that claims that "the convictions of Murder, Aggravated Murder and Aggravated Burglary were against both the weight and sufficiency of the evidence."  Doc. 1, pp. 22-23.

Accordingly, Petitioner should be denied federal habeas relief on the portion of Ground One that claims that inconsistent verdicts amount to insufficient evidence because that claim has been procedurally defaulted.  The merits of the second portion of Ground One are addressed in Section IV.B.1 below.

### 2.  Ground Four is procedurally defaulted

In Ground Four, Cutts asserts that "where there was uncontroverted evidence presented by the defense that the deaths were not intentionally caused, it is a due process violation when the trial court failed to instruct the jury on the lesser included offense of involuntary manslaughter."  Doc. 1, pp. 28-30.  Respondent asserts, and the undersigned agrees, that Petitioner has procedurally defaulted Ground Four because Petitioner presented Ground Four to the state courts as a question of state law rather than as a federal constitutional claim.  Doc. 8, p. 34, p. 48.

As discussed above, in order to fairly present federal constitutional claims to the state courts, a petitioner must present the claims as federal constitutional issues and not merely as issues arising under state law and, further present the claim to the state's highest court.  In state court, Cutts, relying on state law, argued that the trial court abused its discretion by failing to instruct on involuntary manslaughter but he did not fairly present a federal constitutional due

process claim.[12]  Exhibit 50, pp. 4-9 (Petitioner's court of appeals brief); Exhibit 54, pp. 4-6

(Petitioner's memorandum in support of jurisdiction filed with the Ohio Supreme Court).

Following his argument that the trial court abused its discretion in failing to include a jury

instruction on the lesser included offense of involuntary manslaughter, Cutts summarily

concluded that "[s]aid actions clearly controlled the overall outcome of the case and thereby

deprived Defendant of a fair trial."  Doc. 50, p. 9.  However, he failed to provide or rely upon

federal constitutional law to support this conclusory statement and he did not present his

argument in a manner that would have alerted the state court to the federal nature of his claim.

*See, e.g.*, *Franklin*, 811 F.2d at 325; *Prather*, 822 F.2d at 1421 (requiring a petitioner to present

his claims to the state courts as federal constitutional issues and not merely as issues arising

under state law).  In his memorandum in support of jurisdiction to the Ohio Supreme Court,

Cutts failed to include even the conclusory statement that appeared in his brief to the court of

appeals, i.e., that he was deprived of a fair trial.  Doc. 54, pp. 4-6.  Thus, even if Cutts could be

said to have raised a federal constitutional claim at the state appellate court level, he failed to

present that claim to the state's highest court as is required in order to satisfy the fair presentation

requirement.  *See O'Sullivan*, 526 U.S. at 845-848; *Hafley*, 902 F.2d at 483.

     In contrast to his presentation of his claim before the state courts, Cutts now argues that

"due process requires that a lesser included offense is required when the evidence warrants such

an instructions" and relies on U.S. Supreme Court cases in support of his argument.  Doc. 1, p.

28 (relying on *Beck v. Alabama*, 447 U.S. 625, 636 (1980) and *Hopper v. Evans*, 456 U.S. 605,

611 (1982)).  Since Cutts failed to make these due process arguments to the state courts, it cannot

be said that he presented both the factual and legal underpinnings of Ground Four to the state

---

[12] The Ohio Court of Appeals overruled Cutts's first assignment of error alleging a state law error based on the trial court's denial of Cutts's request for a jury instruction on involuntary manslaughter.  Exhibit 52, ¶¶ 62-126.  One Judge dissented as to the first assignment of error with respect to Counts One and Two. Exhibit 52, ¶¶ 262-346.

courts so as to alert those courts to his federal constitutional claim.  Further, Cutts does not claim, nor can he show, that state court remedies remain available to him to raise his federal constitutional claim now asserted in Ground Four.  Because Cutts failed to fairly present a claim that his due process rights were violated and because state court remedies are no longer available to Cutts to assert that claim, Ground Four is procedurally defaulted. *Williams*, 460 F.3d at 806. Accordingly, unless Cutts can overcome the default, Ground Four is procedurally barred from federal habeas review.  *O'Sullivan,* 526 U.S. at 845-848; *Coleman,* 501 U.S. at 732; *Williams,* 460 F.3d at 806.

As discussed above, with respect to Ground One, to overcome a procedural bar, a petitioner must show cause for the default and actual prejudice that resulted from the alleged violation of federal law or must show that there will be a fundamental miscarriage of justice if the claims are not considered.  *Coleman*, 501 U.S. at 750.  Cutts relies on his argument that he did in fact fairly present a federal constitutional due process claim in his direct appeal and fails to argue either "cause" or "prejudice" for the default.  Doc. 12, pp. 5, 15.  He makes only a conclusory statement that failure to give the lesser included offense of involuntary manslaughter instruction was a miscarriage of justice.  Doc. 12, p. 15.  Since Cutts does not argue "cause" or "prejudice" for his default of Ground Four and since he provides this Court with only a conclusory statement that there has been a fundamental miscarriage of justice, he has failed to establish grounds to excuse his default of Ground Four.

Based on the foregoing, the undersigned concludes that Petitioner has procedurally defaulted Ground Four and has failed to overcome the procedural default.  Accordingly, Petitioner should be denied federal habeas relief on Ground Four.

### 3.   Ground Seven is procedurally defaulted

In Ground Seven, Cutts asserts that "the admission of out-of-court hearsay statements purportedly made by a two (2) year old child [Cutts's son Blake] violated the Petitioner's right of confrontation under the Sixth Amendment."  Doc. 1, pp. 34-37.   Respondent asserts that Ground Seven is procedurally defaulted because Cutts waived this argument when he failed to object at trial to the admission of the two-year-old's testimony and thereby failed to preserve the issue for appeal.  Doc. 8, pp. 44-46, 47-48.   In support of his argument, Respondent argues that the state court of appeals determined that Cutts had failed to renew his motion in limine or object at the appropriate time during trial and the state court of appeals enforced Ohio's contemporaneous objection rule when it concluded that Cutts had waived his argument concerning statements made by two-year-old Blake to Sergeant Weisburn.  Doc. 8, pp. 44-46, 47-48.   Further, Respondent asserts that Ohio's contemporaneous objection rule is an adequate and independent state ground that, absent a showing of cause and prejudice, precludes federal habeas review. Doc. 8, pp. 47-48.

In response, Cutts states that he disagrees "with the procedural application of the Waiver Rule in this Case."  Doc. 12, p. 6.  He asserts that he sufficiently preserved the issue for appeal by raising the issue at a motion hearing and because he "specifically objected to the testimony of Sergeant Weisburn during trial."[13]  Doc. 12, p. 6 (citing trial transcript pp. 222-227).

Where the issue involves a petitioner's failure to observe a state procedural rule, analysis under *Maupin* is necessary.  *Stojetz v. Ishee*, 389 F.Supp.2d 858, 882 (S.D. Ohio 2005).   Under the first *Maupin* prong, the issue is whether there is a state procedural rule applicable to petitioner's claim and whether petitioner failed to comply with that rule. *Maupin,* 785 F.2d at

---

[13] Blake's statements to Sergeant Weisburn included the following: "mommy is crying;" "mommy is in the rug;" "mommy broke the table;" and "daddy's mad."  Exhibit 58 – Vol. 1, pp. 228-229.

138.  Here, the State asserts that Cutts failed to preserve his claimed error concerning the admission of two-year-old Blake's statements for appeal.  Doc.  pp. 44-46, 47-48.  Respondent's argument is supported by the state court of appeals' opinion, which states:

> Appellant presently not only does not identify where in the record he objected to this testimony at trial, but also fails to assert he even objected at trial.  As such, we find Appellant has waived this argument.

Exhibit 52, ¶192.  Petitioner now points to a portion of the trial transcript to support his argument that he objected to Sergeant Weisburn's testimony during trial. Doc. 12, p. 6 (citing trial transcript pp. 222-227).  However, Petitioner failed to provide the Ohio Court of Appeals with the transcript cite and the Ohio Court of Appeals relied on Petitioner's failure to fully support his claim to conclude that Petitioner waived the claim.  Further, Petitioner failed to challenge the Ohio Court of Appeals' finding of waiver in any proceeding, including his appeal to the Ohio Supreme Court.  Additionally, Petitioner failed to object when Patricia Porter, Jessie Davis's mother, was asked, "When you asked Blakey where is [mommy] did he respond?" Exhibit 59 – Vol. 1, p. 84.  In response, Ms. Porter testified, "Yes.  He said mommy is crying.  Mommy broke the table.  Mommy is in the rug."  Exhibit 59 – Vol. 1, p. 84.  Thus, because Petitioner did not object to similar statements that were elicited through the testimony of Patricia Porter, Petitioner is unable to demonstrate that he complied with the contemporaneous objection rule as it relates to the admission of statements made by Blake.  Moreover, even if Petitioner's identification of one specific objection at trial was sufficient to demonstrate that Petitioner had complied with Ohio's contemporaneous objection rule, Petitioner also failed to fully exhaust his claim on direct appeal because he failed to provide the state courts with the factual underpinnings of his federal claim in order to allow the state courts a full opportunity to resolve his constitutional claim. *Williams v. Bagley*, 380 F.3d 932, 966-967 (6th Cir. 2004) (citing *O'Sullivan*, 526 U.S. at 845).

Petitioner would thus be barred by *res judicata* from now challenging the state court of appeals'
finding of waiver.  *Williams v. Bagley*, 380 F.3d at 967 (noting that "claims are barred under
Ohio's doctrine of *res judicata*, which provides in relevant part that a final judgment of
conviction bars a convicted defendant from raising in any proceeding, except an appeal from that
judgment, any issue that was raised, or could have been raised, at trial or on appeal from that
judgment."); *McMeans*, 228 F.3d at 681 (a habeas petitioner must present both the factual and
legal underpinnings of his claims to the state courts).  Based on the foregoing, the undersigned
concludes that the first prong of *Maupin* is satisfied and/or that Petitioner failed to fairly present
his Ground Seven claims.

Under the second *Maupin* prong, the issue is whether the state court enforced the
procedural rule.  *Maupin,* 785 F.2d at 138.  Here, the Ohio Court of Appeals enforced the state
procedural rule when it concluded Petitioner had waived his arguments concerning the admission
of two-year-old Blake's statements.  Exhibit 52, ¶192.

Under the third *Maupin* prong, the issue is whether the state procedural rule is an
adequate and independent state ground on which the state can foreclose review of the federal
constitutional claim.  *Maupin,* 785 F.2d at 138.  Both Ohio's contemporaneous objection rule and
*res judicata* are adequate and independent state grounds for precluding federal habeas review.
*Williams v. Bagley*, 380 F.3d at 967-968.  Further, even though the Ohio Court of Appeals
alternatively considered the merits of Petitioner's claim concerning the admission of two-year-
old Blake's statements, that review does not constitute a waiver of the procedural default.[14]  *See*
*Hinkle v. Randle*, 271 F.3d 239, 244 (6th Cir. 2001).

---

[14] The undersigned notes that, even if Ground Seven was not procedurally defaulted, Petitioner has failed to
demonstrate that the Ohio Court of Appeals' alternative merits review of Petitioner's claims concerning the
admission of Blake's statements was contrary to or an unreasonable application of federal law.  The Ohio Court of
Appeals determined that Blake's statements were non-testimonial because they were made in response to an

Under the fourth *Maupin* prong, the issue is whether the petitioner can demonstrate cause for his failure to follow the rule and that he was actually prejudiced by the alleged constitutional error. *Maupin,* 785 F.2d at 138.  Cutts does not argue and has not demonstrated "cause" for his failure to properly preserve the issues in Ground Seven for appeal and/or to advise the state courts that he had objected to the testimony that he argued was admitted in error.  While Cutts argues prejudice, he does so in a conclusory manner.  He asserts that admission of two-year-old Blake's statements "violated his Sixth Amendment Right of Confrontation and was very damaging testimony."  Doc. 12, p. 6.  Since Petitioner has failed to demonstrate or argue "cause" for the procedural default of Ground Seven and since his conclusory statement regarding prejudice is insufficient to overcome the procedural default of Ground Seven,[15] the undersigned concludes that Petitioner has procedurally defaulted Ground Seven.  Accordingly, Petitioner should be denied federal habeas relief on Ground Seven.

### 4.  Ground Eight is procedurally defaulted

In Ground Eight, Cutts asserts that "the State's unrestricted use of character evidence that was irrelevant and inflammatory, denied the Petitioner's [sic] his right to a fair trial."  Doc. 1, pp. 37-38.  More specifically, Petitioner challenges the state trial court's admission of testimony from Jill Butler, Stephanie Hawthorne, and Jennifer Sprout, with whom he allegedly had extra-marital affairs.  Doc. 1, pp. 37-38.  He asserts that admission of that testimony denied him his

---

interrogation with the primary purpose being to enable the police to meet an ongoing emergency, i.e. the search for Davis, who was nine months pregnant and whose whereabouts remained unknown at the time of Blake's statements to law enforcement.  Exhibit 52, ¶195-199.  This finding is supported by the record and, as properly found by the Ohio Court of Appeals, the statements therefore were not admitted in violation of Petitioner's right to confrontation. Additionally, as to whether or not the trial court properly admitted the statements as excited utterances, "it is not the province of a federal habeas court to reexamine state-court determination on state-law questions.  In conducting habeas review, a federal court is limited to deciding whether a conviction violated the Constitution, laws, or treaties of the United States."  *Estelle v. McGuire,* 502 U.S. 62, 67-68 (1991).

[15] Moreover, any claim of prejudice is negated by petitioner's failure to object to the similar testimony of Patricia Porter.

right to a fair trial.  Doc. 1, pp. 37-38.  Respondent asserts, and the undersigned agrees, that Petitioner has procedurally defaulted Ground Eight because Petitioner presented Ground Eight to the state courts as a question of state law rather than as a federal constitutional claim.  Doc. 8, pp. 35-36, p. 48.  Further, the undersigned concludes that, to the extent that the Petitioner asserted a due process claim to the state appellate court, he failed to present that claim to the state's highest court.

As discussed above, in order to fairly present a claim to the state courts, a petitioner must present his claims to the state courts as federal constitutional issues and not merely as issues arising under state law; moreover, a federal constitutional claim for relief must be presented to the state's highest court in order to satisfy the fair presentation requirement.  Rather than demonstrate to this Court how he fairly presented Ground Eight to both the state appellate and state supreme court Cutts argues, without citation to relevant or supporting legal authority, that "[s]urely, the violation of State evidentiary Rules can rise to the level of a violation of a federal constitutional right."  Doc. 12, p. 20.

In state court, he argued that alleged prejudicial testimony of Butler, Hawthorne, and Sprout was admitted in contravention of Ohio Evidence Rule 403.[16]  Exhibit 50, pp. 31-33 (Petitioner's court of appeals brief); Exhibit 54, pp. 13 (Petitioner's memorandum in support of jurisdiction filed with the Ohio Supreme Court).  Following that argument, Cutts summarily concluded that "[i]t was incumbent upon the Trial Court to safeguard the trial and the constitutional rights of the Defendant without restricting the State's ability to introduce relevant evidence as to the crimes allegedly committed. Accordingly, by allowing its admission, the Trial Court committed reversible error and denied Defendant a fundamentally fair trial."  Exhibit 50,

---

[16] Cutts also asserted that Todd Porter's testimony was improperly admitted.  Exhibit 50, pp. 31-33; Exhibit 54, p. 13.  However, in Ground Eight, Cutts does not raise claims relative to the admission of Todd Porter's testimony.

p. 33.   However, he failed to provide cites to or rely upon cases applying federal constitutional law to alert the state court to the federal nature of his claim.  *See, e.g.*, *Franklin*, 811 F.2d at 325; *Prather*, 822 F.2d at 1421 (requiring a petitioner to present his claims to the state courts as federal constitutional issues and not merely as issues arising under state law).  In his memorandum in support of jurisdiction to the Ohio Supreme Court, Cutts omitted even the conclusory statement that he made to the state court of appeals that he was deprived of a fair trial; he argued only that the testimony of Butler, Hawthorne, and Sprout was admitted in contravention of State Evidence Rule 403.  Exhibit 54, p. 13.  In his memorandum in support of jurisdiction, Cutts combined his arguments relating to the testimony of Butler, Hawthorne, and Sprout with his arguments regarding the admission of statements made by his two-year-old son.  Exhibit 54, pp. 13-14.  While Cutts relied upon federal case law in support of his arguments concerning the admission of statements made by the two year old, he did not do so in relation to the testimony of Butler, Hawthorne, and Sprout.  Exhibit 54, pp. 13-14. Thus, even if Cutts could be said to have raised a federal constitutional claim with the state appellate court, he failed to present that claim to the state's highest court as is required in order to satisfy the fair presentation requirement.  *See O'Sullivan*, 526 U.S. at 845-848; *Hafley*, 902 F.2d at 483.

Based on the undersigned's review of Petitioner's filings in the state court of appeals and Ohio Supreme Court, it cannot be said that Cutts presented both the factual and legal underpinnings of Ground Eight to the state courts in a manner that would have alerted the state courts to his federal constitutional claim.  Further, Cutts does not claim nor can he show that state court remedies remain available to him to raise his federal constitutional claim now asserted in Ground Eight.  Because Cutts failed to fairly present a claim that his due process rights were violated and because state court remedies are no longer available to him to assert that claim,

Ground Eight is procedurally defaulted. *Williams*, 460 F.3d at 806. Accordingly, unless Cutts can overcome the default, Ground Eight is procedurally barred from federal habeas review. *O'Sullivan,* 526 U.S. at 845-848; *Coleman,* 501 U.S. at 732; *Williams,* 460 F.3d at 806.

To overcome the procedural bar, Cutts must show cause for the default and actual prejudice that resulted from the alleged violation of federal law or must show that there will be a fundamental miscarriage of justice if the claims are not considered. *Coleman*, 501 U.S. at 750. However, Cutts does not argue, or attempt to argue, cause or prejudice for the default or that there will be a fundamental miscarriage of justice if his claim is not considered. He simply asserts that he did not procedurally default Ground Eight. Doc. 12, p. 20.

Based on the foregoing, the undersigned concludes that Petitioner procedurally defaulted Ground Eight and has failed to overcome the procedural default. Accordingly, Petitioner should be denied federal habeas relief on Ground Eight.

## C. Ground Ten is moot

In Ground Ten, Cutts asserts that "the trial court's failure to dismissed [sic] capital specifications to the indictment was a violation of his due process rights."[17] Doc. 1, pp. 39-41. The undersigned agrees with the conclusion of the Ohio Court of Appeals that Ground Ten is moot.[18]

> {¶ 219} In his tenth assignment of error, Appellant argues the trial court erred by failing to dismiss the capital specifications of the Indictment because such specifications had no foundation in law or fact.[FN1] Specifically, Appellant challenges the capital specification alleging he caused the death of two or more

---

[17] Petitioner raised this claim in his tenth assignment of error in the state appellate court (Exhibit 50, pp. 33-35) and in his ninth proposition of law in his Ohio Supreme Court memorandum in support of jurisdiction (Exhibit 54, pp. 14-15).

[18] Additionally, it does not appear that Petitioner presented his claim regarding the capital specifications to the state courts as a federal constitutional issue. Thus, petitioner arguably has also failed to exhaust his claim and therefore, such claim, in addition to being moot, could also be subject to procedural default analysis. *See, e.g., Franklin*, 811 F.2d at 325; *Prather*, 822 F.2d at 1421 (to fairly present a claim to the state courts, a petitioner must present her claims to the state courts as federal constitutional issues and not merely as issues arising under state law).

persons in the course of conduct, one being the death of a child under the age of 13. Appellant also takes issue with the sufficiency of the allegations for a capital specification due to the commission of an aggravated burglary.

> FN1. Again, Appellant failed to reference where in the record he made this argument to the trial court.

{¶ 220} Following the mitigation phase of the trial, the jury did not recommend the death penalty. Because capital punishment has ceased to be an issue in this case, we find the arguments raised herein to be moot.[FN2]

> FN2. Furthermore, we found in our discussion of Appellant's fourth and fifth assignments of error, supra, the jury's verdict as to the aggravated burglary count was not based upon insufficient evidence and was not against the manifest weight of the evidence.

{¶ 221} Accordingly, we overrule Appellant's tenth assignment of error.

Exhibit 52, ¶¶219-221.

Petitioner has failed to demonstrate that the Ohio Court of Appeals' decision was contrary to or an unreasonable application of clearly established federal law or that Ground Ten is not moot.  To the extent that Petitioner has attempted to argue that the issue is not moot because the inclusion of the capital specifications somehow prejudiced him (Doc. 12, pp. 21-22), as noted, Petitioner did not receive the death penalty and Petitioner has failed to demonstrate a substantial and injurious effect or influence of the death specifications on the jury's verdict.  *See e.g.*, *Maxey v. Donat*, 2012 WL 295632, *5 (D. Nev. Jan. 31, 2012) (relying on *Brecht v. Abrahamson*, 507 U.S. 619, 637 (1993) and *Lockhard v. McCree*, 476 U.S. 162, 178 (1986) when rejecting a petitioner's claim that, although he was not sentenced to death, the "death qualified" jury was more prone to impose a harsher sentence).

For the foregoing reasons, the undersigned recommends that Ground Ten be found to be moot and that Petitioner be denied federal habeas relief on Ground Ten.

## IV. Merits Review

### A.  Summary of merits review findings

As explained more fully below, Cutts has failed to demonstrate that the state court's adjudication of the claims presented in the portion of Ground One that has not been procedurally defaulted and in Grounds Two, Three, Five, Six, and Nine resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding. 28 U.S.C. § 2254(d).  Thus, the undersigned concludes that the portion of Ground One that has not been procedurally defaulted and the entirety of Grounds Two, Three, Five, Six, and Nine are without merit and federal habeas relief should be denied.

### B.  Standard of Review under AEDPA

The provisions of the Antiterrorism and Effective Death Penalty Act of 1996, Pub.L. No. 104-132, 110 Stat. 1214 ("AEDPA"), apply to Cutts's habeas petition because he filed it after the effective date of the AEDPA. *Stewart v. Erwin*, 503 F.3d 488, 493 (6th Cir. 2007).  In particular, the controlling AEDPA provision states:

> An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim-
>
> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).  A decision is "contrary to" clearly established federal law when the state court arrives at a conclusion opposite to that reached by the Supreme Court on a question of law or decides a case differently than the Supreme Court has on a set of materially indistinguishable facts.  *Otte v. Houk*, 654 F.3d 594, 599 (6th Cir. 2011) (quoting *Williams v. Taylor*, 529 U.S. 362, 412-13 (2000)).  A state court's adjudication only results in an "unreasonable application" of clearly established federal law when the state court identifies the correct governing legal principle from the Supreme Court's decisions but unreasonably applies that principle to the facts of the prisoner's case.  *Id*. at 599-600 (quoting *Williams*, 529 U.S. at 413).  "The 'unreasonable application' clause requires the state court decision to be more than incorrect or erroneous." *Lockyer v. Andrade*, 538 U.S. 63, 75 (2003).  "The state court's application of clearly established law must be objectively unreasonable."  *Id.*

In order to obtain federal habeas corpus relief, a petitioner must establish that the state court's decision was "so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." *Bobby v. Dixon*, 132 S. Ct. 26, 27 (2011) (quoting *Harrington v. Richter*, 131 S. Ct. 770, 786–87 (2011). This bar is "difficult to meet" because "habeas corpus is a 'guard against extreme malfunctions in the state criminal justice systems,' not a substitute for ordinary error correction through appeal." *Richter*, 131 S. Ct. at 786 (quoting *Jackson v. Virginia*, 443 U.S. 307, 332 n.5 (1979) (Stevens, J., concurring in judgment)).  In short, "[a] state court's determination that a claim lacks merit precludes federal habeas relief so long as 'fairminded jurists could disagree' on the correctness of the state court's decision." *Id*. (quoting *Yarborough v. Alvarado*, 541 U.S. 652, 664 (2004)).  The petitioner carries the burden of proof. *Cullen v. Pinholster*, 131 S.Ct. 1388, 1398 (2011).  Cutts has not met his burden in this case.

**1.  The portion of Ground One that is not procedurally defaulted is without merit**

In the portion of Ground One that has not been procedurally defaulted,[19] Cutts asserts: "the convictions of Murder, Aggravated Murder and Aggravated Burglary were against both the weight and sufficiency of the evidence."[20]  (Doc. 1, pp. 22-23).

**a.  Sufficiency of evidence standard**

On federal habeas review, a state court's determination regarding a sufficiency of evidence claim is entitled to a "double layer" of deference.  *Tucker v. Palmer*, 541 F.3d 652, 656 (6th Cir. 2008).  The first layer of deference goes to the factfinder; the second goes to the state reviewing court as required by the AEDPA.  *Id.*  As explained in *Brown v. Konteh*, 567 F.3d 191, 205 (6th Cir. 2009), deference is due to the jury's finding of guilt because the standard, announced in *Jackson v. Virginia*, 443 U.S. 307 (1979), is whether "viewing the trial testimony and exhibits in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt."  *Id.*  This standard "gives full play to the responsibility of the trier of fact fairly to resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from the basic facts to ultimate facts." *Id.* at 319.  The standard is not whether the trier of fact made the correct guilt or innocence determination but, rather, whether it made a rational decision to convict or acquit.  *Herrera v. Collins*, 506 U.S. 390, 402 (1993).  In making this determination, a court does not reweigh the evidence or redetermine the credibility of the witnesses.  *Matthews v. Abramajtys,* 319 F.3d 780, 788 (6th Cir. 2003).  In addition, circumstantial evidence alone may be sufficient to support a

---

[19] *See* Section III.B.1 above for discussion of the procedural default of a portion of Ground One.

[20] Petitioner raised this claim as part of his fourth and fifth assignments of error in the state appellate court (Exhibit 50, pp. 16-24) and in his second proposition of law in his Ohio Supreme Court memorandum in support of jurisdiction (Exhibit 54, pp.7-9).

conviction. *Newman v. Metrish*, 543 F.3d 793, 796 (6th Cir. 2008) (internal citation omitted).  In

considering a sufficiency claim, "circumstantial evidence is entitled to equal weight as direct

evidence." *Durr v. Mitchell*, 487 F.3d 423, 449 (6th Cir. 2007).

Ultimately, even if a review of the evidence were to lead to the conclusion that a rational

trier of fact could not have found guilt beyond a reasonable doubt, a federal habeas court "must

still defer to the state appellate court's sufficiency determination as long as it is not

unreasonable." *Brown*, 567 F.3d at 205; *see also White v. Steele*, 602 F.3d 707, 710 (6th Cir.

2009).  A claim that the evidence was constitutionally insufficient to support a conviction is a

mixed question of law and fact. *Starr v. Mitchell*, 234 F.3d 1270, at *3 (6th Cir. 2000)

(unpublished).  Thus, "a writ of habeas corpus may be issued for evidence insufficiency only if

the state court adjudication 'resulted in a decision that was contrary to, or involved an

unreasonable application of, clearly established Federal law, as determine by the Supreme Court

of the United States,' 28 U.S.C. §2254(d)(1), or was based on 'an unreasonable determination of

the facts in light of the evidence presented in the State court proceeding,' 28 U.S.C.

§2254(d)(2)." *Id.*

### b.  Petitioner's sufficiency of evidence claim is without merit

Cutts argues that his convictions of murder, aggravated murder, and aggravated burglary

are not supported by sufficient evidence because there was no evidence of a purposeful killing

and he was a consensual visitor in Davis's home.  Doc. 1, pp. 21-23.

First, deference is due to the jury's verdict based on the evidence before it. *Brown*, 567 F.3d

at 205.  In assessing whether the jury's decision was a rational one, it is not for this Court to

reweigh the evidence or judge the credibility of the witnesses. *Matthews*, 319 F.3d at 788.  The

undersigned cannot conclude under *Jackson* that, when viewing the evidence in the light most

favorable to the prosecution, no rational trier of fact could have found the essential elements of the crimes of which Cutts was convicted beyond a reasonable doubt. *See Jackson*, 443 U.S. 307.

Second, even if a review of the evidence were to lead to the conclusion that a rational trier of fact could not have found guilt beyond a reasonable doubt, deference is due to the court of appeals' sufficiency determination as long as it is not unreasonable. *Brown*, 567 F.3d at 205*; see also White*, 602 F.3d at 707.  As discussed more fully below, in reviewing the Ohio Court of Appeals' decision, the undersigned concludes that its sufficiency determination is not contrary to or an unreasonable application of clearly established federal law.

In addressing Cutts's sufficiency of the evidence claim, the Ohio Court of Appeals applied the federal standard through use of state law that relied upon the federal standard. In doing so, the Ohio Court of Appeals concluded that:

> {¶ 157}  Appellant's fourth and fifth assignments of error have some overlap; therefore, we shall address said assignments of error together.

> {¶ 158}  In his fourth assignment of error, Appellant maintains the trial court erred in denying his Crim.R. 29 Motion for Acquittal with respect to the three counts of aggravated murder set forth in Counts One, Two, and Three of the Indictment.

> {¶ 159}  In his fifth assignment of error, Appellant challenges his convictions as against the manifest weight and sufficiency of the evidence.

> *Crim.R. 29 Motion for Acquittal*

> {¶ 160}  Crim. R. 29(A) requires a trial court, upon motion of the defendant, to enter a judgment of acquittal of one or more offenses charged in an indictment if the evidence is insufficient to sustain a conviction of the offense or offenses. However, a trial court may not grant an acquittal by authority of Crim.R. 29(A) if the record demonstrates that reasonable minds can reach different conclusions as to whether each material element of a crime has been proven beyond a reasonable doubt. On appeal of the denial of a Crim .R. 29(A) motion, the "relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt." *State v. Williams,* 74 Ohio St.3d 569, 576, 1996-Ohio-91, 660 N.E.2d 724, citing *State v. Jenks* (1991), 61 Ohio St.3d 259, 574 N.E.2d 492, paragraph two of the syllabus.

{¶ 161} Appellant was indicted on three counts of aggravated murder, in violation of R.C. 2903.01(A), (B), and (C) which provides:

{¶ 162} "(A) No person shall purposely, and with prior calculation and design, cause the death of another or the unlawful termination of another's pregnancy.

{¶ 163} "(B) No person shall purposely cause the death of another or the unlawful termination of another's pregnancy while committing or attempting to commit, or while fleeing immediately after committing or attempting to commit, kidnapping, rape, aggravated arson, arson, aggravated robbery, robbery, aggravated burglary, burglary, terrorism, or escape.

{¶ 164} "(C) No person shall purposely cause the death of another who is under thirteen years of age at the time of the commission of the offense."

{¶ 165} Appellant asserts he was entitled to judgments of acquittal on the three aggravated murder charges as the State failed to present any evidence to establish the mens rea of purposeful. We disagree. Based upon the evidence produced during the State's case-in-chief as set forth in our Statement of the Facts and Case, supra, we find there was more than sufficient evidence to support the trial court's decision to overrule Appellant's Crim.R. 29 Motion for Acquittal.

*Standard of Review-Sufficiency and Manifest Weight of the Evidence*

{¶ 166} In *State v. Jenks* (1981), 61 Ohio St.3d 259, 574 N.E.2d 492, superseded by constitutional amendment on other grounds in *State v. Smith,* 80 Ohio St.3d 89, 1997-Ohio-355, 684 N.E.2d 668, the Ohio Supreme Court set forth the standard of review when a claim of insufficiency of the evidence is made. The Ohio Supreme Court held: "An appellate court's function when reviewing the sufficiency of the evidence to support a criminal conviction is to examine the evidence admitted at trial to determine whether such evidence, if believed, would convince the average mind of the defendant's guilt beyond a reasonable doubt. The relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt." *Id.* at para. two of the syllabus.

Exhibit 52, ¶¶157-166.

As to Petitioner's claim that there was no evidence of purposefulness, in analyzing his sufficiency claim as to Counts One and Two, the Ohio Court of Appeals relied upon its earlier analysis of Petitioner's first assignment of error and concluded that there was sufficient evidence

to support the convictions for murder[21] and aggravated murder.  The Ohio Court of Appeals

stated:

> {¶ 168} Given our disposition of Appellant's first assignment of error, we find
> Counts One and Two were supported by substantial, competent and credible
> evidence as outlined in our Statement of the Facts and Case, supra; therefore, we
> find rational jurors would have found Counts One and Two proven beyond a
> reasonable doubt, and the convictions were not against the sufficiency of the
> evidence. Furthermore, upon review, we conclude the verdicts were not against
> the manifest weight of the evidence.

Exhibit 52, ¶168.  In its analysis of Petitioner's first assignment of error, which related to

Petitioner's claim that a lesser included jury instruction was warranted, the Ohio Court of

Appeals stated the following regarding purposefulness:

> {¶ 124} Moreover, evidence of the purposefulness of Appellant's actions was
> presented at trial. Appellant told his friend, Richard, who testified at trial, that he
> was going to "kill that bitch and throw her in the woods." Additionally, the
> coroner testified that a strike to the throat such as Appellant described would not
> cause asphyxiation and that constant pressure would need to be applied in order to
> cause death by asphyxiation. Specifically, the coroner stated that the person
> would have to apply continual pressure for a period of several minutes in order for
> the person to go unconscious first and then die. While the body was too
> decomposed for the doctor to determine a specific cause of death, the doctor noted
> that there were no fractures to the skull or ribs or any other trauma to the bones.
> Appellant also fled the scene and did not call 9-1-1. He then disposed of the body
> in the middle of a forested area where wild animals were likely to ravage the body
> and then proceeded to lie to the police for days. Appellant only confessed once he
> knew that the officers placed him with Jessie's cell phone in the area where he
> disposed of her body.

> {¶ 125} The nature of the evidence presented shows both purpose and
> consciousness of guilt in his actions following Jessie's murder. For Appellant to
> argue at trial that he did not mean to kill Jessie and her unborn child, and then to
> request an instruction that he engaged in an act of domestic violence would be
> disingenuous and inconsistent with the evidence presented. See *State v. Irwin,*
> Hocking App. Nos. 03CA13, 03CA14, 2004-Ohio-1129.

Exhibit 52, ¶¶124-125.

---

[21] "Ohio's murder statute, R.C. 2903.02(A), states: "No person shall purposely cause the death of another or the
unlawful termination of another's pregnancy."  Exhibit 52, ¶232.

Additionally, as to the aggravated murder conviction under Count Three, the Ohio Court of Appeals stated:

{¶ 169} Appellant was found guilty of aggravated murder, in violation of R.C. 2901.01(C), as alleged in Count Three of the Indictment.

{¶ 170} R.C. 2901.01(C) provides:

{¶ 171} "(C) No person shall purposely cause the death of another who is under thirteen years of age at the time of the commission of the offense."

{¶ 172} Appellant contends an unborn fetus does not constitute a person "under thirteen years of age"; therefore, his conviction in Count Three is against the manifest weight and the sufficiency of the evidence. We disagree.

{¶ 173} R.C. 2901.01(B)(1) defines "person" as follows:

{¶ 174} "(B)(1)(a) Subject to division (B)(2) of this section, as used in any section contained in Title XXIX of the Revised Code that sets forth a criminal offense, "person" includes all of the following:

{¶ 175} "(i) An individual, corporation, business trust, estate, trust, partnership, and association;

{¶ 176} "(ii) An unborn human who is viable."

{¶ 177} Dr. Polifrone, Davis's obstetrician, and Dr. Kohler, the Summit County Medical Examiner, both testified the unborn child was viable and she would have survived had she been born on or about June 14, 2007. Because Davis's fetus was capable of independently surviving her mother at the time of Davis's death, we find Chloe, by statutory definition, was a person under thirteen years of age. Accordingly, we find Appellant's conviction on Count Three was neither against the manifest weight nor the sufficiency of the evidence.

Exhibit 52, ¶¶169-177.

As to Cutts's argument that he was a consensual visitor in Davis's house and therefore there was insufficient evidence to support a conviction for aggravated burglary, the Ohio Court of Appeals concluded that there was sufficient evidence to support the aggravated burglary conviction.  The Ohio Court of Appeals stated:

{¶ 178} Appellant was convicted of aggravated burglary, in violation of R.C. 2911.11(A)(1), which provides:

{¶ 179} "(A) No person, by force, stealth, or deception, shall trespass in an occupied structure or in a separately secured or separately occupied portion of an occupied structure, when another person other than an accomplice of the offender is present, with purpose to commit in the structure or in the separately secured or separately occupied portion of the structure any criminal offense, if any of the following apply:

{¶ 180} "(1) The offender inflicts, or attempts or threatens to inflict physical harm on another. * * * "

{¶ 181} Appellant argues he did not trespass in Davis's home. Although Appellant may have had consent to enter Davis's home to pick up Blake, once he committed an act of violence against Davis, the consent was revoked and Appellant became a trespasser. Where a defendant commits an offense against a person in the person's private dwelling, the defendant forfeits any privilege, becomes a trespasser and can be culpable for aggravated burglary. See, e.g., *State v. Steffen* (1987), 31 Ohio St.3d 111, 115, 509 N.E.2d 383. The jury's conviction on Count Four was not against the manifest weight or the sufficiency of the evidence.

Exhibit 52, ¶¶178-181.[22]

Based upon a review of the record, the undersigned cannot conclude under *Jackson v. Virginia* that, when viewing the evidence in the light most favorable to the prosecution, no rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *See Jackson*, 443 U.S. 307.  Further, the Ohio Court of Appeals indicated that "[t]he relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt." Exhibit 52, ¶166.  This is the correct standard under *Jackson* and Petitioner has failed to demonstrate that the Ohio Court of Appeals' decision is contrary to or an

---

[22] Further, when addressing Petitioner's second assignment of error, the Ohio Court of Appeals found that Cutts had failed to demonstrate prejudicial error because . . . "the second aggravated murder conviction concerning the unborn child (Count Three) was separately premised on Appellant's act of purposely causing the death of another who is under thirteen years of age (R.C. 2903.01(C)), which conviction was merged for sentencing purposes . . ." Exhibit 52, ¶147.  As discussed above, Petitioner's claim that there were inconsistent verdicts and therefore insufficient evidence to support is convictions was procedurally defaulted.

unreasonable application of this clearly established federal law, or based on an unreasonable determination of the facts in light of the evidence presented.

Accordingly, for the foregoing reasons and for the reasons discussed in Section III.B.1, the Petitioner should be denied federal habeas relief on Ground One.

### 2.  Ground Two is without merit

In Ground Two, Cutts asserts that "an accused is entitled to a change of venue when it was clearly evident that the jury had been so exposed by pre-trial publicity that the jury had detailed knowledge of the case."[23]  Doc. 1, pp. 23-25.  In support of Ground Two, Petitioner argues that "there was an overwhelming likelihood of prejudice due to the extensive nature of the coverage which preceded the Trial;" "the venire in its entirety showed a detailed knowledge of the case, the facts at issue and an overwhelming leaning toward the opinion that Petitioner must be guilty due to the information being reported by the media;" and "the jury, as seated, included individuals who personally participated in the search for the body of the victim which created a predilection towards identification of the State's case; several others who believed Petitioner was guilty but who pledged to reserve absolute ruling until hearing of the actual evidence; and the remainder all followed some or all of the coverage of the crime prior to being selected."  Doc. 1, pp. 24-25.

Cutts argues that the Ohio Court of Appeals' decision is contrary to or an unreasonable application of the U.S. Supreme Court's decisions in *Irvin v. Dowd,* 366 U.S. 717 (1961), *Estes v. Texas*, 381 U.S. 532 (1965)*, Sheppard v. Maxwell*, 384 U.S. 333 (1966), and *Skilling v. U.S.*,

---

[23] Petitioner raised this claim in his third assignment of error in the state appellate court (Exhibit 50, pp. 13-16) and in his fourth proposition of law in his Ohio Supreme Court memorandum in support of jurisdiction (Exhibit 54, pp. 10-11).

48

130 S.Ct. 2896 (2010).[24]  Doc. 12, pp. 12-13.  Respondent argues that the state court's decision was not contrary to or an unreasonable application of clearly established federal law concerning venue.  Doc. 8, pp. 61-64.  Petitioner's attempt to obtain relief on the basis that the Ohio Court of Appeals' decision was contrary to or an unreasonable application of *Skilling* is misplaced since the Court decided *Skilling* after Cutts's direct appeal had been completed.[25]  *Cullen v. Pinholster*, 131 S.Ct. 1388, 1399 (2011) (quoting *Lockyer v. Andrale*, 538 U.S. 63, 71-72 (2003)) (internal quotations omitted) (when reviewing a state court's decision under 28 U.S.C. § 2254(d)(1), the court measures the state court's decision against the U.S. Supreme Court's "precedent as of the time the state court renders its decision").  Nevertheless, reviewing *Skilling* is useful for the purpose of analyzing Petitioner's second ground for relief because the Court, in *Skilling*, reviewed the established federal law relating to claims of a denial of a right to a trial by an impartial jury and applied those standards when it affirmed the denial of a motion to change venue in the criminal trial of a former chief executive officer of Enron.[26]  *Skilling*, 130 S.Ct. 2896.

The *Skilling* Court reiterated that "the theory of our trial system is that the conclusions to be reached in a case will be induced only by evidence and argument in open court, and not by any outside influence, whether of private talk or public print."  *Id.* at 2914 (quoting *Patterson v. Colorado ex rel. Attorney General of Colo.*, 205 U.S. 454, 462 (1907)).  After describing *Rideau*

---

[24] *Skilling* was decided on June 24, 2010.

[25] The Ohio Court of Appeals issued its decision on Cutts's direct appeal on July 22, 2009.  *Skilling* was not decided until June 24, 2010.  Moreover, the U.S. Supreme Court denied Cutts's Petition for Writ of Certiorari on May 17, 2010 (Exhibit 57), prior to issuing its decision in *Skilling*.

[26] "The Sixth Amendment secures to criminal defendants the right to trial by an impartial jury.  By constitutional design, the trial occurs 'in the State where the . . . Crimes . . . have been committed.'"  *Skilling v. U.S.*, 130 S.Ct. 2896, 2912-13 (2010).

*v. Louisiana*, 373 U.S. 723 (1963),[27] *Estes v. Texas*, 381 U.S. 532 (1965),[28] and *Sheppard v. Maxwell*, 384 U.S. 333 (1966)[29] as cases where convictions had been overturned because the trial atmosphere "was utterly corrupted by press coverage," the Court indicated that those "decisions, however, 'cannot be made to stand for the proposition that juror exposure to . . . news accounts of the crime . . . alone presumptively deprives the defendant of due process.'" *Id.* at 2914 (quoting *Murphy v. Florida*, 421 U.S. 794, 798-99 (1974)).  "The petitioner bears the burden of showing utter corruption of the proceedings." *Turnage v. Wilson*, 2006 WL 2380623, *2, (N.D. Ohio Aug. 14, 2006) (citing *Dobbert v. Florida*, 432 U.S. 282, 303 (1976) wherein the petitioner had only proved that the jury pool was well aware of the case).  "Prominence does not necessarily produce prejudice, and juror *impartiality*, we have reiterated, does not require ignorance." *Skilling*, 130 S.Ct. at 2914-15 (citing *Irvin v. Dowd*, 366 U.S. 717, 722 (1961) (emphasis in original).[30]  "A presumption of prejudice, our [the Court's] decisions indicate, attends only the extreme cases." *Skilling*, 130 S.Ct. at 2914-15.  "Pretrial publicity — even pervasive, adverse publicity — does not inevitably lead to an unfair trial." *Id.* at 2916 (quoting *Nebraska Press Assn. v. Stuart*, 427 U.S. 539, 554 (1976)).  "To hold that the mere existence of any preconceived notion as to the guilt or innocence of an accused, without more, is sufficient to

---

[27] In *Rideau*, the defendant's videotaped police interrogation including his confession was televised on three separate occasions prior to trial.  *Skilling*, 130 S.Ct. at 2913-14.

[28] In *Estes*, "the media's overzealous reporting efforts . . . led to considerable disruption and denied the judicial serenity and calm to which Billie Sol Estes was entitled." *Skilling*, 130 S.Ct. at 2914 (citing and quoting *Estes*, 381 U.S. at 536) (internal quotations omitted).

[29] In *Sheppard*, "[b]edlam reigned at the courthouse during the trial and newsmen took over practically the entire courtroom thrusting jurors into the role of celebrities." *Skilling*, 130 S.Ct. at 2914 (citing and quoting *Sheppard*, 384 U.S. at 353, 355) (internal quotations omitted).   The Court in *Skilling* noted that "Sheppard's case involved more than heated reporting pretrial: We [the Court] upset the murder conviction because of a 'carnival atmosphere.'" *Id.* (citing and quoting *Sheppard*, 384 U.S. at 358) (internal quotations omitted).

[30] In *Irvin*, where there was intense publicity, two-thirds of the venire possessed a belief in the defendant's guilt, and voir dire examination showed that eight of the twelve jurors finally placed in the jury box thought the defendant was guilty, the Court determined that the defendant's jury was not impartial.  *Irvin*, 366 U.S. 717.

rebut a presumption of a prospective juror's impartiality would be to establish an impossible

standard." *Irvin*, 366 U.S. at 723.  "It is sufficient if the juror can lay aside his impression or

opinion and render a verdict based on the evidence presented in court." *Id.*  A trial court's

finding of impartiality as to a juror should not be set aside unless the error is manifest.  *Id.* at

723-24.

Where there is no presumed prejudice, a court looks next to whether actual prejudice

infected the jury.  *Id.* at 2917; *see also Ritchie v. Rogers*, 313 F.3d 948, 956 (6th Cir. 2002).  "To

determine whether actual prejudice occurred, reviewing courts examine the nature of the voir

dire and media coverage."  *Turnage*, 2006 WL 2380623 at *2.

In reviewing Cutts's third assignment of error, the Ohio Court of Appeals stated:

{¶ 150} In his third assignment of error, Appellant contends the trial court erred
in denying his motion for a change of venue.

{¶ 151} Appellant explains, "After receipt and review of the juror questionnaires
and the initial phase of the jury selection process, Defendant filed a motion
seeking a change of venue due to detailed knowledge of the allegations amongst
the vast majority of the venire." Appellant's Brief at 13-14. The trial court
conducted a hearing on Appellant's motion on February 1, 2008, and subsequently
denied the request.

{¶ 152} Both parties agree the standard of review to be applied is abuse of
discretion. In order to find an abuse of discretion, we must find the trial court's
decision constituted more than an error of law, that the ruling was unreasonable,
arbitrary, or unconscionable. *State v. McKnight,* 107 Ohio St.3d 101, 837 N.E.2d
315, 2005-Ohio-6046.

{¶ 153} The State counters the examination of jurors during voir dire affords the
best test to determine prejudice from pretrial publicity. We agree. Extensive
exposure to pretrial publicity does not, in and of itself, preclude the seating of a
fair and impartial jury. A jury venire is not required to be ignorant of the facts and
issues of a particular case. Voir dire is the mechanism for determining whether a
fair and impartial jury can be seated.

{¶ 154} The State adds the record does not support Appellant's argument a
change of venue was mandated because Appellant "deliberately" chose not to
include a transcript of the extensive voir dire which took place in this case. Upon

51

questioning by this Court at oral argument, Appellant responded he complied with App.R. 9(B) by serving notice on the State that he was not ordering the entire transcript of the voir dire and included a statement of the assignment of error he intended to present on appeal with regard to this issue. The State did not elect to seek supplementation of the record with the entire transcript of voir dire. Appellant concluded, therefore, the presumption of regularity under *Knapp v. Edwards Lab.* (1980), 61 Ohio St.2d 197, 199, 400 N.E.2d 384, does not apply.

{¶ 155} Regardless, Appellant still has the affirmative duty to demonstrate in the record prejudicial error. As we previously stated, prior knowledge acquired through pretrial publicity does not equate to the inability to seat a fair and impartial jury. While such prejudice may have been evident from review of the entire voir dire process, the limited portion of the transcript Appellant chose to include in the appellate record does not affirmatively demonstrate prejudicial error. Appellant claims there was "... an overwhelming likelihood of prejudice ..." Appellant's Brief at 15. Such speculation or conclusion is not a substitute for demonstration of error and prejudice in the record.

{¶ 156} Appellant's third assignment of error is overruled.

Exhibit 52, ¶¶150-156.

While the Ohio Court of Appeals did not cite specifically to U.S. Supreme Court precedent, it applied the correct U.S. Supreme Court law when it indicated that "[e]xtensive exposure to pretrial publicity does not, in and of itself, preclude the seating of a fair and impartial jury. A jury venire is not required to be ignorant of the facts and issues of a particular case." Exhibit 52, ¶153; *see Irvin*, 366 U.S. at 722 (concluding that "[i]t is not required, however, that the jurors be totally ignorant of the facts and issues involved"); *Murphy v. Florida*, 421 U.S. 794, 799 (1975) (concluding that the prior cases of *Rideau*, *Estes*, and *Sheppard* do not stand for the proposition that "juror exposure to information about a state defendant's prior convictions or to news accounts of the crime with which he is charged alone presumptively deprives the defendant of due process").

Cutts's argument that the Ohio Court of Appeals' decision is contrary to or an unreasonable application of the U.S. Supreme Court's decisions in *Irvin*, *Estes* and *Sheppard*

(Doc. 12, p. 13) is without merit.  In *Irvin*, the U.S. Supreme Court specifically stated that "[i]t is not required, however, that the jurors be totally ignorant of the facts and issues involved." *Irvin*, 366 U.S. at 722.  While the Court, in *Irvin*, concluded that the defendant's guilty verdict had been rendered by a jury that was not impartial, the Court's conclusion that prejudice existed was based on a review of detailed supporting documentation. *Id.* at 717.  Here, as indicated, Cutts has failed to point to specific portions of the proceedings that demonstrate prejudice. Furthermore, the hearing transcript from Cutts's motion to change venue demonstrates that the trial court undertook detailed voir dire proceedings to ensure selection of an impartial jury and that the trial court provided sufficient rationale for its decision to deny the motion to change venue.  Exhibit 58-4, pp. 158-171.  Additionally, although Cutts asserts that several of the jurors who were seated believed that he was guilty, he concedes that each of those jurors also pledged to reserve ruling until they heard the actual evidence.  Doc. 1, p. 25.

Cutts's case is also distinguishable from *Estes* and *Sheppard* where the primary focus was the actual trial proceedings themselves.  As recently stated by the U.S. Supreme Court, "Sheppard's case involved more than heated reporting pretrial: We [the Court] upset the murder conviction because of a 'carnival atmosphere.'" *Skilling*, 130 S.Ct. at 2914 (citing and quoting *Sheppard*, 384 U.S. at 358) (internal quotations omitted).  In *Estes*, the Court held that the defendant was deprived of due process by virtue of the fact that his trial was televised and broadcast. *Estes*, 381 U.S. 532.  In a case with facts more similar to this one, the Sixth Circuit agreed that there was no presumed or actual prejudice requiring a change of venue. *Ritchie*, 313 F.3d 948.  In *Ritchie*, the defendant was convicted of murdering her 4 year old daughter. *Id.* at 949-950.  Ritchie reported her child missing and, prior to the discovery of her daughter, there was a massive search for the child. *Id.*  Notwithstanding the "intense publicity" surrounding the

search for the missing 4 year old child, the subsequent discovery of the body, and the child's funeral, the Sixth Circuit agreed that there was no presumed or actual prejudice requiring a change of venue. *Ritchie*, 313 F.3d 948. A review of the hearing transcript from Cutts's motion to change venue reveals that, similar to the trial court in *Ritchie*, Cutts's state trial judge, through a detailed voir dire process, took steps to determine whether the publicity rose to the level of "actual prejudice." Exhibit 58-4, pp. 158-171.

 After properly concluding that exposure to pretrial publicity alone does not equate to the inability to seat a fair jury and recognizing that "voir dire is the mechanism for determining whether a fair and impartial jury can be seated," the Ohio Court of Appeals proceeded to review the transcript of the proceedings to determine whether actual prejudice in the selection of the jury was evident. Exhibit 52, ¶¶153, 155. Based on the limited transcript that Cutts chose to include in the record on appeal, the Ohio Court of Appeals concluded that Petitioner had not affirmatively demonstrated prejudicial error in the record. Exhibit 52, ¶155. Further, the Ohio Court of Appeals indicated that Cutts's speculative and conclusory statement that there was an "overwhelming likelihood of prejudice" was not a substitute for demonstration of error and prejudice in the record. Exhibit 52, ¶155. Cutts, by failing to supply the state court with the entire transcript of the voir dire proceedings, cannot be said to have satisfied his burden of demonstrating the "utter corruption of the proceedings." *Cf. Turnage*, 2006 WL 2380623 at *2. Cutts makes similar conclusory statements to this Court. For example, without any specific references to portions of the transcript supportive of his claims, Cutts states: "The Warden claims that the record was incomplete, and the Petitioner could not make a case of actual prejudice. This argument is completely wrong since transcripts of the proceedings sufficiently demonstrate our claims." Doc. 12, p. 12. These conclusory statements are insufficient to demonstrate to the

undersigned that the Ohio Court of Appeals' decision was contrary to or an unreasonable application of clearly established federal law.

Based on the foregoing, Petitioner has failed to demonstrate that the state court's determination that a change of venue was not warranted was contrary to or an unreasonable application of clearly established federal law.  Accordingly, Petitioner's request for relief under Ground Two should be denied.

### 3.  Ground Three is without merit

In Ground Three, Cutts asserts that "a juror who participated in the search of the victim should have been excused for cause as a matter of law and thus petitioner's sixth amendment right to a fair and impartial jury was violated."[31]  Doc. 1, pp. 26-28.  Cutts states that the trial court denied his requests to excuse for cause "any potential juror that had participated in the search, or who had a close friend or family member that had been involved."  Doc. 1, pp. 27-28. Further, Cutts states that, after he had used all of his peremptory challenges on other jurors, one juror who had participated in the search remained on the jury.  Doc. 1, p. 28.  Cutts argues that the foregoing resulted in presumed or implied bias and his right to a fair and impartial jury was violated.  Doc. 1, pp. 26-28.  He contends that, when the Ohio Court of Appeals determined that the trial court did not err in not removing for cause prospective jurors who participated in the search for Davis, it unreasonably applied *Smith v. Phillips*, 455 U.S. 200 (1982) and *Irvin v. Dowd*, 366 U.S. 717 (1961).

Respondent argues that the state court's decision was not contrary to or an unreasonable application of federal law.  Doc. 8, pp. 65-66.  Respondent argues further that, even if the state

---

[31] Petitioner raised this claim in his twelfth assignment of error in the state appellate court (Exhibit 50, p. 38) and in his fifth proposition of law in his Ohio Supreme Court memorandum in support of jurisdiction (Exhibit 54, pp.11-12).

court had found error, Cutts has failed to provide evidence of prejudice based as required by

*Brecht v. Abrahamson*, 507 U.S. 619, 636 (1993).  Doc. 8, pp. 65-66.

In reviewing Cutts's twelfth assignment of error, the Ohio Court of Appeals stated:

{¶ 243} In his twelfth assignment of error, Appellant maintains the trial court erred by refusing to remove for cause from the venire those prospective jurors who had participated in the search for Davis.

{¶ 244} As part of the voir dire process, the prospective jurors were given written questionnaires; one of which concerned whether the individual or any members of his/her family had participated in the search. Appellant submits the purpose of this question was to eliminate any potential juror who had already formed any emotional attachment to the victims or the case itself. Appellant sought removal for cause of those jurors who gave a positive response to the question. The trial court denied removal for cause.

{¶ 245} One of the challenged prospective jurors was eventually seated on the jury after Appellant had exercised all of his preemptory challenges. Appellant concludes, "... it is difficult to imagine a more potentially prejudicial circumstance could arise" and to allow the juror in question to serve " * * * is a blatant miscarriage of justice and demonstrates an unconscionable act on the part of the Trial Court that is an overwhelming abuse of discretion." Appellant's Brief at 38.

{¶ 246} This Court has concerns about the propriety of allowing any individual who either participated or had an immediate family member participate in the search for Davis. We believe the better practice would have been to excuse any such prospective juror for cause to avoid any possibility of partiality or bias on the part of the jury. However, we agree with the State that participation in the search, standing alone, is insufficient to affirmatively demonstrate the juror in question could not be fair and impartial. As set forth in our discussion of Appellant's third assignment of error, the failure to transcribe the entire voir dire makes an affirmative demonstration of prejudicial error difficult, if not impossible. We find no such demonstration here.

{¶ 247} Appellant's twelfth assignment of error is overruled.

Exhibit 52, ¶¶243-247.

Notwithstanding his recognition that a finding of "implied bias" may only be available in

extreme or exceptional cases, Cutts attempts to argue that his claim presents such an extreme or

exceptional case and thus the Ohio Court of Appeals unreasonably applied *Smith* and *Irvin* when

it found no error.  Doc. 1, p. 27.  Cutts relies on *Irvin* for the proposition that a defendant has a

right to an impartial jury composed of jurors who are indifferent to the case.  Doc. 1, p. 27.

However, as indicated above, *Irvin* does not require "that the jurors be totally ignorant of the

facts and issues involved."  *Irvin*, 366 U.S. at 722.  Thus, while a juror who participated in a

search for a victim may not have been totally ignorant of the facts and issues involved, the Ohio

Court of Appeals' determination that "participation in the search, standing alone, is insufficient

to affirmatively demonstrate the juror in question could not be fair and impartial" cannot be said

to be an unreasonable application of *Irvin*.

Relying on Justice O'Connor's concurrence in *Smith*, Cutts also argues that the Ohio

Court of Appeals unreasonably applied *Smith v. Phillips*, 455 U.S. 209 (1982).  Doc. 1, p. 27;

Doc. 12, p. 14.   In *Smith*, following trial, the defendant discovered that, while the trial was

pending, the prosecutors who were handling defendant's case had learned, but not disclosed, that

a juror had submitted an application for employment with the district attorney's office.  *Smith*,

455 U.S. at 212-214.  The Court concluded that the defendant had not been denied due process of

law either by the juror's conduct or by the prosecutor's failure to disclose the juror's job

application.  *Smith*, 455 U.S. 209.   In a concurring opinion, Justice O'Connor provided

examples of when implied bias may have application, such as: where "the juror is an actual

employee of the prosecuting agency, that the juror is a close relative of one of the participants in

the trial or the criminal transaction, or that the juror was a witness or somehow involved in the

criminal transaction."  *Smith*, 455 U.S. at 222.  It is this portion of the concurring opinion upon

which Cutts relies.  Doc. 1, p. 27.  However, he fails to articulate or demonstrate how the Ohio

Court of Appeals unreasonably applied *Smith* and/or fails to point to clearly established federal

law requiring a finding of implied bias where a prospective juror has assisted in a search for the victim.

Further, in connection with his argument that implied bias should be found, Cutts also relies on *Johnson v. Luoma*, 425 F.3d 318, 326 (6th Cir. 2005).  Doc. 1, p. 27.  In *Johnson*, after a verdict was rendered against the defendant in a case involving convictions for domestic violence and kidnapping, the defendant learned that a juror had not disclosed that she was a complaining witness in a domestic violence case.  He sought and was denied a new trial. *Johnson*, 425 F.3d at 322-23.  The Sixth Circuit later affirmed the district court's denial of federal habeas review and in doing so rejected the defendant's reliance on the implied-bias doctrine for two reasons.  *Id.* at 326.  First, the Sixth Circuit indicated that "the implied-bias doctrine may not even be viable after *Smith*" noting that "[c]ourts that had reviewed the *Smith* decision . . . have suggested that the majority's treatment of the issue of implied juror bias calls into question the continued vitality of the doctrine."  *Id.*  Second, the Sixth Circuit concluded that "even if we assume that the implied-bias doctrine is still viable, Johnson has failed to show that this is one of the 'extreme' or 'exceptional' cases that merit such a finding."  *Id.*  In light of the fact that the *Johnson* case did not result in a finding of implied bias and in fact called into doubt the viability of an implied bias doctrine, Cutts's reliance upon *Johnson* to bolster his argument is unpersuasive.

Further, in addition to failing to demonstrate that the Ohio Court of Appeals unreasonably applied clearly established federal law when it did not find implied bias, Cutts failed to present the Ohio Court of Appeals with evidence of actual prejudice.  Exhibit 52, ¶246.  Likewise, Cutts fails to direct this Court to where in the record actual prejudice is shown to exist.  Moreover, through a detailed voir dire process, the trial judge assessed the credibility of the jurors'

58

statements concerning their impartiality and concluded that he believed the truthfulness of their answers.  Exhibit 58-4, pp. 167-169.  Thus, as argued by the Respondent, even if the trial court were found to have erred in not excusing for cause those individuals who participated in the search for Davis, habeas relief is not warranted since Cutts has failed to demonstrate actual prejudice.  Doc. 8, pp. 65-66 (relying on *Brecht v. Abrahamson*, 507 U.S. 619, 636 (1993) for the proposition that, in order for a petitioner to be entitled to habeas relief based on a trial court's error, the error must have had a "substantial and injurious effect or influence" on the jury's verdict).

Based on the foregoing, Cutts has failed to demonstrate that the Ohio Court of Appeals' decision was contrary to or an unreasonable application of clearly established federal law and/or that there was an error entitling him to federal habeas relief on the grounds of actual prejudice. Accordingly, the Petitioner's request for federal habeas relief on Ground Three should be denied.

### 4.  Ground Five is without merit

In Ground Five, Cutts asserts that "an alternative method of using Ohio driver's license records to expand the prospective jury venire should have been utilized to ensure a jury composed of a fair cross-section of the community as guaranteed by the Sixth and Fourteenth Amendments."[32]  Doc. 1, pp. 30-32.  Cutts argues that an alternative method was necessary to ensure a representative number of African Americans in the jury selection process.  Doc. 1, p. 30.  Respondent contends that the Ohio Court of Appeals' determination of this issue was not contrary to or an unreasonable application of clearly established federal law.  Doc. 8, pp. 66-68. Further, Respondent contends that Petitioner failed to provide the state courts with the necessary facts to support his claims.  Doc. 8, p. 68.

---

[32] Petitioner raised this claim in his sixth assignment of error in the state appellate court (Exhibit 50, pp. 24-26) and in his seventh proposition of law in his Ohio Supreme Court memorandum in support of jurisdiction (Exhibit 54, p.13).

In reviewing Cutts's sixth assignment of error, the Ohio Court of Appeals stated:

{¶ 183} In his sixth assignment of error, Appellant submits the trial court erred in denying his motion to expand the prospective jury venire through driver's license registrations. Appellant asserts drawing the venire solely from registered voters deprived him of his Sixth Amendment right to a jury drawn from "a fair cross section of the community". See, generally, *State v. Fulton,* (1991), 57 Ohio St.3d 120, 566 N.E.2d 1195, para. two of the syllabus.

{¶ 184} The Sixth Amendment to the United States Constitution does not require that petit juries "mirror the community and reflect the various distinctive groups in the population." *Taylor v. Louisiana* (1975), 419 U.S. 522, 538, 95 S.Ct. 692, 42 L.Ed.2d 690. However, the method employed for selecting the groups from which juries are drawn "must not systematically exclude distinctive groups in the community and thereby fail to be reasonably representative thereof." *Id.*

{¶ 185} In *Duren v. Missouri* (1979), 439 U.S. 357, 99 S.Ct. 664, 58 L.Ed.2d 579, the United States Supreme Court set forth the prerequisites a defendant must satisfy in order to establish a prima facie violation of *Taylor's* fair cross-section requirement:

{¶ 186} "[T]he defendant must show (1) that the group alleged to be excluded is a 'distinctive' group in the community; (2) that the representation of this group in venires from which juries are selected is not fair and reasonable in relation to the number of such persons in the community; and (3) that the underrepresentation is due to systematic exclusion of the group in the jury-selection process." *Id.* at 364, 95 S.Ct. at 668.

{¶ 187} For purposes of fair, cross-section analysis, African-Americans are a distinctive group. *State v. Jones* (2001), 91 Ohio St.3d 335, 340, 744 N.E.2d 1163. However, with respect to the second prong of the *Duren* test, Appellant has failed to prove African-Americans in Stark County are unfairly represented in venires relative to their numbers in the community. Appellant has also failed to satisfy the third prong of *Duren,* as he has not presented any evidence of systematic exclusion of African-Americans. Appellant simply argues, without more, voter registration rolls result in the systematic exclusion of African-Americans.

{¶ 188} As Appellant has failed to satisfy the second and third prong of the *Duran* [sic] test, we find no error in the trial court's denial of Appellant's motion to expand the prospective jury venire. See, e.g., *State v. Yarbrough,* 95 Ohio St.3d 227, 767 N.E.2d 216, 2002-Ohio-2126 at ¶ 103-106. (Calling of venire solely from voter registration list as opposed to list of licensed drivers did not violate defendant's right to fair and impartial jury.)

{¶ 189} Appellant's sixth assignment of error is overruled.

Exhibit 52, ¶¶183-189.

Notwithstanding the Ohio Court of Appeals' detailed analysis of the applicable Supreme Court precedent, Cutts argues, in conclusory fashion, that "the trial court and appellate Courts unreasonably applied Supreme Court precedent in determining that there was no Sixth Amendment violation." Doc. 12, p. 16. In support of this conclusory argument, he asserts that the "Appellate Court ignored the fact that the Ohio Statute §2313.08 had provided a mechanism to allocate the exclusion of ethnic minorities. Moreover, the trial court also ignored the dearth of minority representation in the jury selection process of the co-defendant Myisha Ferrell." Doc. 12, p. 16. However, Cutts has not articulated how these facts, even if true, demonstrate an unreasonable application of clearly established federal law.

The Ohio Court of Appeals, in reaching its conclusion that there was "no error in the trial court's denial of Appellant's motion to expand the prospective jury venire," relied, in part, on *State v. Yarbrough,* 95 Ohio St.3d 227, 767 N.E.2d 216, 2002-Ohio-2126 at ¶ 103-06, wherein the Ohio Supreme Court specifically addressed R.C. § 2313.08 when concluding that the calling of venire solely from the voter registration list, as opposed to the list of licensed drivers, did not violate a defendant's right to a fair and impartial jury. Exhibit 52, ¶188. Thus, Cutts's claim that the Ohio Court of Appeals ignored R.C. § 2313.08 is unfounded.

As to Cutts's claim that the trial court "ignored the dearth of minority representation in the jury selection process of the co-defendant Myisha Ferrell," (Doc. 12, p. 16), the trial court did not ignore Cutts's arguments regarding the jury selection process of his co-defendant Myisha Ferrell. *See* Exhibit 58-1, Transcript of Hearing 11-16-07, p. 28, p. 34 (citing to *Duren* to

indicate that you cannot just look at one poll or snapshot);[33] *see Duren*, 439 U.S. at 366 (the defendant had shown a large discrepancy occurring, not just occasionally, but in every weekly venire for a period of nearly a year).  Rather, the trial court determined that Cutts had failed to meet his burden of showing systematic exclusion.  In fact, when the trial court provided Cutts's counsel with an opportunity to explain what they were pointing to in order to show that the group's underrepresentation was the result of a systematic exclusion of the group in the jury selection process, Cutts's counsel did not point to other evidence.  Exhibit 58-1, Transcript of Hearing 11-16-07, pp. 30-31.  Instead, he indicated that that was not the issue; he stated that the issue was that R.C. § 2313.08 provides the court with discretion to use driver's license records and Cutts was requesting that the Court exercise that discretion.  Exhibit 58-1, Transcript of Hearing 11-16-07, pp. 26-37.

Cutts has failed to show that the state courts unreasonably applied clearly established federal law.  To the contrary, the Ohio Court of Appeals properly relied upon the Supreme Court precedent of *Taylor v. Louisiana*, 419 U.S. 522 (1975) and *Duren v. Missouri*, 439 U.S. 357 (1979) in analyzing Cutts's request to use driver's license records as an alternative method to expand the prospective jury venire and concluded that Cutts had failed to satisfy the requirements under *Duren* to show a violation of *Taylor's* fair cross-section requirements.  The trial court also relied on the same Supreme Court precedent in reaching its decision.  Exhibit 58-1, Transcript of Hearing 11-16-07, pp. 26-37.

Because Cutts has failed to show that the state court's decision was contrary to or an unreasonable application of clearly established federal law, Petitioner's request for federal habeas relief on Ground Five should be denied.

---

[33] The trial court also noted that the defendant had provided statistical census data only from the City of Canton as opposed to the entire County of Stark.  Exhibit 58-1, Transcript of Hearing 11-16-07, pp. 20-21, 22, 27.

### 5.   Ground Six is without merit

In Ground Six, Cutts asserts that "a request for grand jury testimony should be granted when there is a particularized need demonstrated by the Petitioner, and a denial of such is a violation of due process."[34]  Doc. 1, pp. 30-32.  Petitioner asserts that he demonstrated a particularized need for grand jury testimony for "two (2) reasons: (1) the State's case was premised upon allegations of oral admissions made to witnesses and/or to the co-defendant Myisha Ferrell, which were not provided pursuant to Rule 16, Ohio Rules of Criminal Procedure;[35] and (2) the death specification contained in the Indictment was based upon allegations of a burglary for which no evidence was produced but merely a legal theory."  Doc. 1, pp. 32-33.  He claims that the denial of his request for grand jury testimony "was not based on a reasonable determination of the facts" (Doc. 12, p. 17) and, as a result, he was denied his right to a fair trial.  Doc. 1, pp. 30-32; Doc. 12, pp. 16-17.

Respondent asserts that the Ohio Court of Appeals reasonably relied upon *State v. Greer*, 66 Ohio St. 2d 139 (1981) and did not unreasonably apply that standard in concluding that the trial court did not abuse its discretion in denying Petitioner's request for disclosure of grand jury testimony.  Doc. 8, pp. 68-72.  Further, the Respondent asserts that the state court decisions were not based on an unreasonable determination of the facts.  Doc. 8, p. 72.

In reviewing Cutts's eighth assignment of error, the Ohio Court of Appeals stated:

{¶ 200} In his eighth assignment of error, Appellant asserts the trial court erred in denying his motion to disclose grand jury testimony.

{¶ 201} Ohio Crim.R. 6(E) provides:

---

[34] Petitioner raised this claim in his eighth assignment of error in the state appellate court (Exhibit 50, pp. 29-31) and in his sixth proposition of law in his Ohio Supreme Court memorandum in support of jurisdiction (Exhibit 54, p.12-13).

[35] Petitioner makes specific claims concerning the testimony of Richard Mitchell (Doc. 1, p. 33) which are addressed in further detail below.

{¶ 202} "Deliberations of the grand jury and the vote of any grand juror shall not be disclosed. Disclosure of other matters occurring before the grand jury may be made to the prosecuting attorney for use in the performance of his duties. A grand juror, prosecuting attorney, interpreter, stenographer, operator of a recording device, or typist who transcribes recorded testimony, may disclose matters occurring before the grand jury, other than the deliberations of a grand jury or the vote of a grand juror, but may disclose such matters only when so directed by the court preliminary to or in connection with a judicial proceeding, or when permitted by the court at the request of the defendant upon a showing that grounds may exist for a motion to dismiss the indictment because of matters occurring before the grand jury. No grand juror, officer of the court, or other person shall disclose that an indictment has been found against a person before such indictment is filed and the case docketed. The court may direct that an indictment shall be kept secret until the defendant is in custody or has been released pursuant to Rule 46. In that event the clerk shall seal the indictment, the indictment shall not be docketed by name until after the apprehension of the accused, and no person shall disclose the finding of the indictment except when necessary for the issuance of a warrant or summons. No obligation of secrecy may be imposed upon any person except in accordance with this rule."

{¶ 203} Grand jury testimony is secret by nature, and will remain such, absent a showing by the defendant of a particularized need which outweighs the need for secrecy. *State v. Greer* (1981), 66 Ohio St.2d 139, 420 N.E.2d 982. A particularized need exists when the circumstances show a probability the accused will be denied a fair trial without the grand jury testimony. *State v. Davis* (1988), 38 Ohio St.3d 361, 528 N.E.2d 925. A trial court has discretion to decide when a particularized need exists, and thus will not be reversed absent an abuse of discretion. *State v. Greer,* supra.

{¶ 204} Appellant argues a particularized need existed for two reasons. First, the State failed to provide Appellant with admissions he made to witnesses and/or to his codefendant, Myisha Ferrell, when the State's case-in-chief was premised solely upon those alleged admissions. Second, the State allegedly failed to produce any evidence of a burglary upon which one of the death specifications was based.

{¶ 205} A review of the record reveals the State complied with the requirements of Crim.R. 16 and provided Appellant with the names of the witnesses it intended to call at trial as well as the exculpatory statements he made to Myisha Ferrell. Additionally, a review of the Bill of Particulars and the State's responses to Appellant's motions to dismiss reveal Appellant was put on notice of the case law the State intended to rely upon to establish the revocation of privilege to support the aggravated burglary charge. Accordingly, we find the trial court did not abuse its discretion in denying Appellant's request for the disclosure of grand jury testimony.

{¶ 206} Appellant's eighth assignment of error is overruled.

Exhibit 52, ¶¶200-206.

Petitioner recognizes that Ohio law does not mandate disclosure of grand jury proceedings except when the "ends of justice" so require it.  Doc. 1, p. 34 (citing *Greer*, 66 Ohio St. 2d at 139).  Thus, a defendant must demonstrate a "particularized need" in order to be entitled to grand jury proceedings normally kept secret.  *Greer*, 66 Ohio St. 2d at 145.  The determination as to whether there has been a showing of a "particularized need" is within the discretion of the trial court.  *Id.* at 144.  Following a hearing on Cutts's motion, the trial court denied the motion upon concluding that Cutts had not demonstrated a "particularized need" for the grand jury testimony.  Exhibit 58-1, Transcript of Hearing 11-16-07, pp. 19-20.

To the extent that Petitioner's sixth ground for relief asserts an error of state law, "it is not the province of a federal habeas court to reexamine state-court determination on state-law questions.  In conducting habeas review, a federal court is limited to deciding whether a conviction violated the Constitution, laws, or treaties of the United States."  *Estelle v. McGuire*, 502 U.S. 62, 67-68 (1991); *see also Treesh v. Bagley*, 2007 WL 1039081, *17 (N.D. Ohio Mar. 31, 2007) (relying on *Estelle* for its finding that, to the extent that the petitioner was claiming an error of state law relative to the denial of his request for a record of grand jury proceedings, the court could not rule on the matter).  "[M]isapplication of state law is not cognizable in a federal habeas proceeding unless a petitioner can prove that the error deprived him of a fair trial or proceeding."  *Russell v. Anderson*, 2008 WL 4534144, *6 (N.D. Ohio Oct. 6, 2008) (concluding that the petitioner had failed to establish a due process violation based on the trial court's denial of his request for grand jury transcripts).

To the extent that Petitioner asserts a due process claim for failure to provide the grand jury transcripts to allow him to fully prepare his defense, the undersigned concludes that Petitioner has failed to demonstrate a denial of due process.  Petitioner claims he was "sand-bagged" at trial by Richard Mitchell's testimony[36] and thus the trial court's denial of his request for grand jury testimony denied him his right to a fair trial.[37]  Doc. 12, p. 17.  Respondent argues that Petitioner did not ask for pre-trial disclosure of Richard Mitchell's grand jury testimony; the State had identified Richard Mitchell as a witness, and Petitioner's investigator had an opportunity to talk with Mitchell.  Doc. 8, p. 72.  Petitioner does not refute these arguments and the trial transcript supports them.  *See also* Exhibit 59 – Vol. III, pp. 777-784.  Petitioner simply responds to these arguments by stating that the failure of his investigator to obtain Richard Mitchell's statement is not relevant to "any legal analysis showing or demonstrating a particularized need for the grand jury testimony."  Doc. 12, p. 16.  As indicated above, re-examining the state-court determination on the state-law question as to whether there was a showing of a "particularized need" is not for this Court.  *See Estelle*, 502 U.S. at 67-68.

Because Cutts has failed to demonstrate that, where there has been an insufficient showing of particularized need, the denial of grand jury transcripts constitutes a due process violation, his request for federal habeas relief on Ground Six should be denied.

### 6.  Ground Nine is without merit

---

[36] At trial, Richard Mitchell testified that Cutts said to him, "I'm going to kill that bitch and throw her in the woods." Exhibit 59, p. 786.

[37] Petitioner also argues that the State failed to provide evidence of aggravated burglary through discovery.  Doc. 12, p. 17.  However, he fails to provide sufficient substance to this argument or address Respondent's argument that the State relied upon and provided citations to case law that it intended to use to demonstrate that an aggravated burglary occurred, and therefore the grand jury testimony was not necessary.  Doc. 8, p. 72.  Accordingly, the undersigned finds this argument waived.  *See McPherson*, 125 F.3d at 996 ("Issues adverted in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived.") (citations omitted).  Further, to the extent that Petitioner was attempting to obtain the grand jury transcript to challenge the indictment, such an argument lacks merit.  *See Treesh*, 2007 WL 1039081 at *18 (finding petitioner's claim that he needed grand jury testimony to attack his indictment lacked merit).

In Ground Nine, Cutts asserts that "it is a violation of due process when a trial court imposes maximum and consecutive sentences when the convictions are allied offenses and should be merged for sentencing purposes."[38]  Doc. 1, pp. 38-39.  The three convictions that Petitioner claims are allied offenses of similar import are:  murder, aggravated murder, and aggravated burglary.  Doc. 1, pp. 38-39.  He argues that the three convictions all arose from a single act and therefore the sentences should have merged and imposition of consecutive sentences was contrary to R.C. § 2941.25.  Doc. 1, p. 39; Doc. 12, p. 21.  Petitioner has thus asserted a claim based on a violation of state law, i.e., a violation of R.C. § 2941.25.  Federal habeas corpus courts may only consider whether a conviction violates the United States Constitution. 28 U.S.C. § 2254(a); *Lewis v. Jeffers,* 497 U.S. 764, 780 (1990).  Accordingly, to the extent that Cutts asserts that his conviction and sentence violate R.C. § 2941.25, such a claim is not cognizable on federal habeas review.

Although the Respondent has treated Ground Nine as including a claim for violation of federal double jeopardy on the theory that "R.C. 2941.25, was drafted to implement the requirements of the federal Double Jeopardy Clause," Doc. 8, Respondent's Return of Writ, p. 38, FN3 (citing *State v. Rance*,[39] 85 Ohio St.3d 632 (1999)), the undersigned concludes that Petitioner has not presented or sufficiently developed a double jeopardy claim.  *McPherson*, 125 F.3d 989 at 996 ("Issues adverted in a perfunctory manner, unaccompanied by some effort at

---

[38] Petitioner raised this claim in his eleventh assignment of error in the state appellate court (Exhibit 50, pp. 35-37) and in his third proposition of law in his Ohio Supreme Court memorandum in support of jurisdiction (Exhibit 54, p.9-10).

[39] The Supreme Court of Ohio, in *State v. Johnson*, 128 Ohio St. 3d 153 (2010), overruled *Rance*, 85 Ohio St. 3d 632.  However, "*Johnson* does not apply retroactively to cases where the defendant has already exhausted his appellate remedies."  *Walters v. Warden, Ross Correctional Inst.*, 2013 WL 1296249, *3 (6th Cir. 2013).

developed argumentation, are deemed waived.").[40]  Neither in his Petition nor Traverse does

Petitioner raise a specific double jeopardy claim based on his convictions and sentences for

murder, aggravated murder, and aggravated burglary.  The arguments raised relate to his claim

that the state courts incorrectly applied state law.  While he argues that the state court's

determination was "in direct contravention of his constitutionally protected rights," Doc. 12, p.

21, he does not support his argument with U.S. Supreme Court precedent nor does he attempt to

articulate or demonstrate that the Ohio Court of Appeals' well reasoned determination that the

offenses at issue were not allied offenses was contrary to or an unreasonable application of

clearly established federal law.[41]  Accordingly, to the extent Petitioner has attempted to assert a

Federal Double Jeopardy claim, Petitioner has waived that claim. *See McPherson*, 125 F.3d at

996.

     To the extent that Cutts has attempted to claim that the state court violated his due

process right when it determined that consecutive sentences could be imposed for his murder,

aggravated murder, and aggravated burglary convictions, he likewise has failed to develop such a

claim sufficiently and thus has waived it.[42]  *See McPherson*, 125 F.3d at 996.

     For the foregoing reasons, Petitioner's request for federal habeas relief on Ground Nine

should be denied.

---

[40] To the extent that Petitioner has asserted a double jeopardy claim in his Petition, Petitioner arguably has also failed to fairly present that claim and such claim could also be subject to a procedural default analysis.  *Cf. Snider v. Tibbals*, 2013 WL 84933, *5 (N.D. Ohio Jan. 7, 2013); *but see Spence v. Sheets*, 675 F. Supp. 2d 792, 824–25 (S.D. Ohio 2009).

[41] *See* Ohio Court of Appeals' discussion and decision regarding Cutts's eleventh assignment of error.  Exhibit 52, ¶¶ 222-242.

[42] In the Ohio Court of Appeals, Cutts included a due process claim that his maximum sentences violated *Blakely v. Washington*, 542 U.S. 296 (2004).  The Ohio Court of Appeals addressed this claim and found no merit to the claim. Exhibit 52, ¶¶223-224.  Cutts did not assert the *Blakely* part of this eleventh assignment of error in his appeal to the Ohio Supreme Court.  Accordingly, that claim is not before this Court.

### V. Conclusion and Recommendation

For the reasons stated above, Cutts's grounds for relief are procedurally defaulted, moot, and/or without merit.  Accordingly, the undersigned recommends that Cutts's Petition for writ of habeas corpus (Doc. 1) be **DENIED**.

Dated: May 2, 2013

_____
Kathleen B. Burke
United States Magistrate Judge

### OBJECTIONS

Any objections to this Report and Recommendation must be filed with the Clerk of Courts within fourteen (14) days after the party objecting has been served with a copy of this Report and Recommendation.  Failure to file objections within the specified time may waive the right to appeal the District Court's order.  *See United States v. Walters*, 638 F.2d 947 (6th Cir. 1981); s*ee also Thomas v. Arn*, 474 U.S. 140 (1985), *reh'g denied*, 474 U.S. 1111 (1986).