UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO

-------------------------------------------------------
:
BOBBY LEE CUTTS, JR.,                               :
                                                   :      CASE NO. 5:11-CV-991
                    Petitioner,                    :
                                                   :
vs.                                                :      OPINION & ORDER
                                                   :      [Resolving Docs. 1, 13, & 21]
KEITH SMITH,                                       :
                                                   :
                    Respondent.                    :
                                                   :
-------------------------------------------------------

JAMES S. GWIN, UNITED STATES DISTRICT JUDGE:

On May 17, 2011, Petitioner Bobby Cutts, Jr. filed a Petition for a Writ of Habeas Corpus under 28 U.S.C. § 2254.[1] Ohio opposed Cutts's Petition.[2]  Under Local Rule 3.1, the matter was referred to Magistrate Judge Kathleen B. Burke.  On May 2, 2013, Magistrate Judge Burke issued a Report and Recommendation that recommended this Court deny Cutts's Petition.[3]  On July 1, 2013, Cutts filed his objections to the Report and Recommendation.[4]  For the following reasons, the Court **ADOPTS** Magistrate Judge Burke's Report and Recommendation, and **DENIES** Cutts's Petition for a Writ of Habeas Corpus.

## I. Background

On August 23, 2007, the Stark County Grand Jury indicted Cutts on seven counts involving the homicide of Jessie Davis and her unborn child.[5]  The indictment charged Petitioner with one count of aggravated murder in the death of Davis; one count of aggravated murder for the unlawful

---

[1] Doc. 1.
[2] Doc. 8.
[3] Doc. 13.
[4] Doc. 21.
[5] Doc. 13 at 2.

Case No. 5:11-CV-991
Gwin, J.

termination of Davis's pregnancy; one count of aggravated murder of a viable, unborn child; one

count of aggravated burglary; two counts of gross abuse of a corpse; and one count of child

endangering.

The Fifth District Court of Appeals set forth facts underlying Cutts's conviction as follows:[5]

{¶ 3} On February 4, 2008, the matter proceeded to jury trial.

{¶ 4} During her testimony, Patricia Porter, Jessie Davis's mother, testified that on June
13, 2007, Jessie dropped off her son, Blake, at Porter's home. She stated that her other
daughter, Audrey Davis, would watch Blake until Porter returned from work. Porter was
not present later that day when Jessie picked up Blake, but spoke with her daughter at
approximately 9:00 p.m., during which time Jessie told Porter that Appellant would be
picking Blake up that evening and that Blake would be with him the following day, June
14, 2007. Porter testified that she and Audrey made attempts to contact Jessie on her cell
phone on June 14, 2007, but her phone went directly to voicemail. Porter said she made
an additional attempt to contact Jessie later that evening but was unsuccessful. Porter
assumed Jessie was asleep and that she would talk to her in the morning.

{¶ 5} Porter stated that she again tried to contact Jessie at approximately 6:00 a.m. the
next day, June 15, 2007, but did not get an answer. When Jessie did not show up to drop
off Blake at Porter's house at their usual time of 7:00 a.m., Porter and Audrey went to
Jessie's residence. Porter entered Jessie's residence through the back sliding glass door
which she had found unlocked. She stated that she entered the kitchen and began calling
for Jessie. She testified that as she walked in, she saw the contents of Jessie's purse
dumped onto the floor. Blake ran into the kitchen in a wet and soiled diaper. Porter
recalled that she actually smelled the child before she saw him. Porter stated that she
asked Blake where his mother was, to which he responded, "Mommy is crying. Mommy
broke the table. Mommy is in the rug." Porter stated that she ran upstairs, calling for
Jessie. Once inside Jessie's bedroom, Porter found the mattress knocked partially off the
bed, a table and lamp knocked over, and bleached patches on the floor. Porter also noticed
the burgundy and gold comforter from Jessie's bed was missing. Porter ran frantically
throughout the house searching for Jessie. When she did not find her daughter, Porter
called 911. Porter recalled that she then told Audrey to telephone Appellant. A neighbor,
who had heard Porter's screams, arrived and assisted with Blake. Police arrived at the
scene, as did Appellant.

. . .

{¶ 9} After speaking with Appellant, Weisburn proceeded to speak with Blake. The

---

[5] *State of Ohio v Bobby Lee Cutts, Jr.*, No. 2008CA000079, 2009 WL 2170687 (Ohio App. Ct. July 22, 2009).

Case No. 5:11-CV-991
Gwin, J.

sergeant asked the child if he knew where his mother was, to which Blake replied, "Mommy is at work." After some time, Blake stated, "Mommy is crying. Mommy is in the rug. Mommy broke the table." Sergeant Weisburn testified that these last statements were not given as answers to any questions he had posed to Blake, and that Blake repeated the statements several times. Blake also stated, "Daddy's mad." Sergeant Weisburn asked the child why his daddy was mad, but Blake just continued to repeat "Daddy's mad." Sergeant Weisburn stated that he then proceeded to collect and read Porter and Audrey's written statements and that prior to leaving the scene, he asked Appellant to return to the sheriff's office with him for further questioning. Weisburn stated that he wished to speak with Appellant in hopes of creating a better timeline of events.

. . .

{¶ 14} . . . Appellant pretended to assist in the search for Davis. However, on June 23, 2007, Appellant and Attorney Brad Iams, who was representing Appellant at the time, arrived at FBI offices and informed the investigation team that he would take them to the location of Jessie's body. After driving approximately two hours, Appellant was able to navigate the investigators to an area in the Hampton Hills Park in Summit County, Ohio. It was there that the investigators found Jessie's body located forty or fifty feet down an embankment. Thereafter, Appellant was placed under arrest.

{¶ 15} Myisha Ferrell, a friend of Appellant since middle school, testified that on the evening of June 13, 2007, she and three girlfriends went to bingo, to the home of the father of one of her friends, and to a sports bar, before returning to her home. When the women returned to Ferrell's residence, they stayed up all night, playing cards, drinking beer, and smoking marijuana. She stated that sometime after 6:00 a.m., on the morning of June 14, 2007, Appellant arrived at her home, which she found unusual because Appellant always telephoned first before coming over. She testified that Appellant told her that he needed to talk to her and that he needed some help. Ferrell stated that she could tell something was wrong with Appellant and described his appearance as "dysfunctional", explaining that he just didn't look right. Ferrell noted that she had never seen Appellant look that way. She stated that she walked with Appellant to his truck, which was parked in an alley near her house. Ferrell acknowledged that she was high on marijuana, but understood what was happening. She stated that she got in the truck with Appellant and they proceeded to Interstate 77, where Appellant began to head north.

{¶ 16} Ferrell stated that as they drove, Appellant told her something was wrong and something bad had happened. Ferrell described Appellant as "nervous looking." Ferrell stated that she did not question Appellant but that after a period of silence, he went on to state that something was wrong with "the baby's mother." Ferrell knew Appellant was referring to his son Blake's mother. She testified that Appellant eventually informed her that Davis's body was in the back of his pick-up truck. Ferrell stated that she asked Appellant what had happened and that he responded with a gesture, raising his arm around his neck. Ferrell asked Appellant about Blake, and Appellant stated that Blake was at the house. Ferrell testified that she thought Appellant meant his house. She said that Appellant made a brief stop at a truck stop in order for Ferrell to use the restroom and that

-3-

Case No. 5:11-CV-991
Gwin, J.

Appellant remained outside of the truck while he waited for her to return.

{¶ 17} She stated that once they were again on the road, they passed a sign which read "Cuyahoga Falls Parks," at which time Appellant stopped his truck in an open field. Both Appellant and Ferrell exited the vehicle. In the bed of the truck, Ferrell observed a pair of feet. When asked by the prosecutor if there was anything preventing her from seeing more, Ferrell responded that she did not see and she "didn't want to see nothing else." Ferrell also stated that she noticed white trash bags in the bed of the truck, and that she could see a burgundy print through 7 the bag. Ferrell then watched as Appellant removed Jessie's body from the truck and walked away. Appellant returned to his truck and the pair traveled back to Canton.

{¶ 18} Ferrell testified that during the return drive, Appellant stopped and deposited the trash bags into a dumpster. She stated that Appellant also stopped a second time at a gas station, washed his truck, and purchased bags of mulch which he placed in the bed of the truck. She recalled that Appellant also placed a call to Jessie's cell phone and left a message asking her why she had never dropped off Blake. Ferrell stated that Appellant then handed her a pink cell phone, which she knew did not belong to him, and Ferrell threw it out the window of the truck. She also recalled that Appellant placed another telephone call to an individual with whom he coached to tell him that he would be late for practice. She said that the two of them then proceeded to Appellant's house, where Appellant took a shower and dressed in wind pants and a t-shirt. Ferrell testified that Appellant asked her if she could see any marks on his chest, but stated that what she saw looked "vague." Ferrell recalled that Appellant had an injury on his pinky finger. When she asked him what had happened, Appellant told her "she" bit him. Ferrell stated that she knew he was referring to Davis. She stated that Appellant then gave her $100.00, and told her that he wished he could give her more. Ferrell testified that she remained at Appellant's residence while he went to football practice. She stated that Appellant and his daughter returned to his house at approximately 1:00 p.m., and then he drove Ferrell home.

{¶ 19} Ferrell testified that the following day Appellant telephoned her and informed her that his baby's mom was missing. Ferrell stated that she thought Appellant was crazy. She stated that Larry Davidson arrived at her house sometime later that day and drove her to Appellant's house. She stated that Appellant instructed her to tell the police she was going to babysit Blake, but that Davis never dropped off the child. After Davidson drove Ferrell back to her house, someone from the sheriff's department arrived to speak with her. She stated that Davidson waited in her living room while she spoke with the sheriff's department in another room. Ferrell stated that afterwards, she returned to Appellant's house and remained there until she needed to leave to go to work on the midnight shift at a Denny's Restaurant. . . .

{¶ 21} The State presented a number of other witnesses whose testimony created a timeline for Appellant's whereabouts between 6:00 p.m. on Wednesday, June 13, 2007, and 2:00 a.m. on Thursday, June 14, 2007. On Wednesday evening, Appellant played softball. The game started between 6:00 p.m. and 6:30 p.m. Following the game, he spoke

-4-

Case No. 5:11-CV-991
Gwin, J.

with some friends and then proceeded to Champs Bar, arriving at approximately 8:15 p.m.
to 8:30 p.m. Appellant had a couple of beers and socialized with friends, including Denise
Haidet, with whom Appellant had previously had an affair. He exited the bar sometime
around 12:30 a.m. At approximately 1:00 a.m., Appellant arrived at the home of Stephanie
Hawthorne, another girlfriend. Appellant stayed with Hawthorne until 2:00 a.m.
Hawthorne called Appellant's cell phone at 2:14 a.m. and spoke with him briefly.

. . .

{¶ 39} Appellant testified that he woke up at 5:20 a.m. on June 14, 2007, and drove
to Jessie's house, arriving at approximately 5:45 a.m. Appellant stated he entered the
home through the garage, which Davis would leave open when she was expecting him
to come for Blake. Appellant says he knocked on the door, entered the house and
called for Davis, who responded from upstairs. Appellant says he went upstairs, found
Davis on the floor in her bedroom, and asked her what was wrong and if she was in
labor. Appellant says Davis told him she was tired and nauseous. Appellant says he
then asked her to get Blake ready and when Davis did not promptly get up, he again
asked her to hurry up. Appellant stated that when she still did not respond quickly, he
helped her get to her feet. Appellant admitted that he could tell Davis was trying to get
her bearings once she was on her feet, but he still pushed her to hurry up as he wanted
to get home and get more sleep. Appellant testified that Davis rebuked him, stating "If
you weren't out last night with your friends all night, you wouldn't be rushing me
now." (February 11, 2008, T. at 201). Appellant recalled he responded that what he did
was not her concern, and he did not have to be there and could instead get Blake over
the weekend. Appellant stated he then attempted to leave, but Davis stepped in front
of him and grabbed his shirt. Appellant said he pulled away and tried to step around
Davis, but she again moved in front of him. Appellant testified that Davis then grabbed
him, telling him he could not leave because she needed to go to work. Appellant said
he replied that he could leave if he could get her out of his way. Appellant stated he
then pretended to stick his finger up his nose and put it in her face, and that Jessie bit
his finger. Appellant said he looked at his finger and told Davis he was "definitely
leaving now, I don't care if you have to work or not." *Id.* at 205.

{¶ 40} Appellant testified he next stepped around Davis and she grabbed him and told
him he could not leave. He stated that in an attempt to free himself from Jessie's grasp,
he pulled his arm away and threw back his elbow, which struck Davis in the throat
area. Appellant stated he was heading toward the door when he heard Davis fall, and
he turned around and saw her lying on the floor. He testified that he went over to her
and asked if she was all right, but she did not respond. Appellant says that he shook
Jessie's shoulders and again asked her if she was all right but she remained
unresponsive. Appellant testified that he unsuccessfully attempted CPR but was unable
to find a pulse. Appellant went on to testify that he saw a bottle of bleach, and that he
poured some into the cap and placed it under Jessie's nose in an attempt to revive her.
Appellant explained that he knocked over the bleach bottle when he stood up.

-5-

Case No. 5:11-CV-991
Gwin, J.

Appellant offered that he did not call 911 because he was unable to turn on Jessie's cell phone, which he located in its charger. Appellant acknowledged that he had his two cell phones in his truck but did not think about getting one from the vehicle to call 911. Appellant says he then collapsed, crying and fell back onto Jessie's bed, pushing the mattress off the box spring. Appellant claims he decided to leave without seeking help, because he knew he would never be able to explain what had occurred. He says that he checked on Blake and, finding him asleep, decided to leave him there while he went to get Ferrell to watch him. Appellant testified he then decided to take Jessie's body with him, placing her in the bed of his truck.

{¶ 41} Appellant says that when he arrived at Ferrell's house he told her that he needed her to come with him immediately. Appellant claims he intended to return to Jessie's house and have Ferrell watch Blake while he went to the police to explain the situation. Instead, he said that as the two were driving north on Interstate 77, he realized he was going to have a difficult time explaining why he moved Jessie's body. Appellant stated that he passed the exit for Jessie's house and continued to drive north. Appellant admitted that at approximately 7:10 a.m., he called Jessie's phone, but says he could not explain why he did so. Appellant said he exited the highway with the intention of returning to Jessie's house. Appellant recalled that he stopped at a rest area in order for Ferrell to use the restroom. Appellant recalled that he next traveled back onto the highway, but a state trooper passed them and he panicked and again exited the highway. He claims he then decided to travel back to Canton on back roads. Appellant testified he did not know where he was and drove around for at least a half an hour looking for a familiar landmark, eventually turning onto a dirt road into a park, where he made the decision to leave Jessie's body there.

. . .

{¶ 45} On cross-examination, the State elicited testimony from Appellant regarding his financial situation, including the increase in child support which would occur with the birth of Jessie's baby and from any obligation resulting from his divorce. Appellant admitted he applied for and received a loan, and that he paid approximately $2800 a month for various debts. The State also inquired of Appellant as to his actions on the morning of June 14, 2007. When asked why he did not get Blake ready instead of hurrying Davis, Appellant explained they had a routine and she was the one who would get Blake ready while he put the car seat in his truck. Appellant acknowledged after Davis fell, he did not retrieve his own cell phone out of his truck in order to call 911 when he was unable to turn on Jessie's phone. Appellant also conceded his attempts at CPR only lasted a few minutes. Appellant stated his actions following Jessie's death and the disposal of the body were an attempt to maintain a sense of normalcy in the hopes that what had happened actually had not happened. Appellant could not explain why he continued to conceal the whereabouts of Davis during the week following her disappearance.

. . .

{¶ 47} After hearing all the evidence and deliberations, the jury found Appellant not guilty

-6-

Case No. 5:11-CV-991
Gwin, J.

of aggravated murder as alleged in Count 1 of the Indictment, but guilty of the lesser-included offense of murder. The jury also found Appellant guilty of the remaining charges and specifications. The trial court scheduled a separate mitigation phase of the trial. At the conclusion of this hearing, the jury recommended Appellant be sentenced to life in prison with parole eligibility after serving thirty years for the two aggravated murder convictions relative to the death of Davis's unborn child. The trial court accepted the jury's recommendation for the two counts of aggravated murder but merged the offenses for purposes of sentencing. The trial court sentenced Appellant to an aggregate term of imprisonment of fifty-seven years to life.

In April 2008, Cutts filed a direct appeal to the Ohio Court of Appeals.[6] The Ohio Court of Appeals affirmed his conviction.[7] In September 2009, Cutts appealed that decision to the Ohio Supreme Court.[8] The Ohio Supreme Court declined to hear his appeal.[9] Cutts petitioned the United States Supreme Court for a writ of certiorari, but the Court denied certiorari.[10]

Cutts then filed this habeas corpus petition, raising ten grounds for relief.[11] First, Cutts says that there was insufficient evidence to support his convictions since "one act and a single animus resulted in both the death of Davis and the unborn fetus," as shown by the jury's "inconsistent" verdicts.[12]

Second, Cutts says that "[a]n accused is entitled to a change of venue when it was clearly evident that the jury had been so exposed by pre-trial publicity that the jury had detailed knowledge of the case."[13]

Third, Cutts says that the trial court violated his Sixth Amendment rights when it failed to

---

[6] Doc. 9-50.

[7] Doc. 9-53.

[8] Doc. 9-54.

[9] Doc. 9-57. The Ohio Supreme Court found that Petitioner's appeal did not involve any "substantial constitutional question." *Id.*

[10] Doc. 1 at 6.

[11] Doc. 1.

[12] *Id.* at 9.

[13] *Id.*

Case No. 5:11-CV-991
Gwin, J.

excuse for cause a juror who had participated in the search for the victim.[14]

Fourth, Cutts says that the trial court violated his due process rights when it "failed to instruct the jury on the lesser included offense of involuntary manslaughter."[15]

Fifth, Cutts says that the trial court violated his Sixth Amendment rights when it declined to expand the pool of possible jurors to include jurors who were licensed to drive even if they were not registered to vote.[16]

Sixth, he says that the trial court violated his rights when it denied him access to the grand jury testimony.[17]

Seventh, he says that the trial court violated his rights by allowing hearsay evidence.[18]

Eighth, Cutts says that the trial court violated his rights when it allowed "irrelevant and inflammatory" character evidence.[19]

Ninth, Cutts says that the trial court violated his rights by failing to merge his sentences because the convictions were "allied offenses."[20]

Tenth, Cutts says that the trial court violated his due process rights when it failed to dismiss the capital specifications to the indictment.[21]

Under Local Rule 72.2(b), Cutts's petition was referred to Magistrate Judge Kathleen B. Burke.  On May 2, 2013, Magistrate Judge Burke issued a Report and Recommendation, that

---

[14] *Id.*

[15] *Id.*

[16] *Id.*

[17] *Id.*

[18] *Id.*

[19] *Id.*

[20] *Id.* at 10.

[21] *Id.*

Case No. 5:11-CV-991
Gwin, J.

recommended this Court deny Cutts's petition.[22]

Cutts now makes ten objections to the Magistrate Judge's determinations.[23]  He says that the Magistrate Judge erred in concluding that a portion of Ground One, Ground Four, Ground Seven and Ground Eight are procedurally defaulted.[24]  He also says that Magistrate Judge Burke erred in finding that a portion of Ground One, Ground Two, Ground Three, Ground Five and Ground Nine are without merit.[25]  The Court considers each of Petitioner Cutts's objections below.

## II. Legal Standard

### A. Federal Magistrates Act

Under the Federal Magistrates Act, a district court only needs to conduct a *de novo* review of those portions of a Report and Recommendation to which the parties have made an objection.[26]

### B. The Antiterrorism and Effective Death Penalty Act

The Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA")[27] governs a federal court's review of a state prisoner's habeas corpus petition.  AEDPA limits federal review to only those claims in which a petitioner contends that he is in custody in violation of the Constitution, laws, or treaties of the United States.[28]  And a federal court cannot grant a habeas petition for any claim that the state court adjudicated on the merits unless the adjudication:

(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established federal law, as determined by the Supreme Court of the United States; or

---

[22] Doc. 13.

[23] Doc. 21.

[24] *Id*. at 2-5.

[25] *Id.* at 5-11.

[26] 28 U.S.C. § 636(b)(1).

[27] Pub. L. No. 104–132, 110 Stat. 1214 (1996); codified at 28 U.S.C. § 2254.

[28] 28 U.S.C. § 2254(a).

Case No. 5:11-CV-991
Gwin, J.

> (2) resulted in a decision that was based upon an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.[29]

To justify any grant of habeas relief, "a federal court must find a violation of law 'clearly established' by holdings of the Supreme Court, as opposed to its dicta, as of the time of the relevant state court decision."[30]  Furthermore,

> under the "contrary to" clause, a federal habeas court may grant the writ if the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law or if the state court decides a case differently than this Court has on a set of materially indistinguishable facts. Under the "unreasonable application" clause, a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from [the Supreme] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case.[31]

The Sixth Circuit holds that, even if a federal court could determine that a state court incorrectly applied federal law, the court still refuse relief unless it also finds that the state court ruling was unreasonable.[32]

Where the state court did not adjudicate a federal constitutional claim on the merits even though it was fairly presented, AEDPA deference does not apply.[33]  In such cases, a federal court applies the pre-AEDPA standard of review and reviews questions of law *de novo* and questions of fact for clear error.[34]

The Federal Magistrates Act requires a district court to conduct *de novo* review only of those

---

[29] 28 U.S.C. § 2254(d).  *See also Miller v. Francis*, 269 F.3d 609, 614 (6th Cir. 2001).

[30] *Id.* (citing *Williams v. Taylor*, 529 U.S. 362, 412 (2000)).

[31] *Williams*, 529 U.S. at 412–13.

[32] *Simpson v. Jones*, 238 F.3d 399, 405 (6th Cir. 2000).

[33] *Evans v. Hudson*, 575 F.3d 560, 564 (6th Cir. 2009).

[34] *Evans*, 575 F.3d at 564; *Maples v. Stegall*, 340 F.3d 433, 436 (6th Cir. 2003).

-10-

Case No. 5:11-CV-991
Gwin, J.

portions of a report and recommendation to which a party has objected.[35/] Accordingly, the Court

addresses only those claims raised in Cutts's objections.

### III. Analysis

Petitioner Cutts raises ten objections to the Magistrate Judge's Report and Recommendation.

The Court will consider each objection in turn.

### A. Objections Regarding Procedurally Defaulted and Unexhausted Claims

Four of Petitioner Cutts's objections concern Magistrate Judge Burke's finding that Petitioner

Cutts procedurally defaulted certain claims because either (1) an independent and adequate state

procedural rule stopped review of his claims or (2) Petitioner did not exhaust review of his claims

in state court and state procedural rules now prevent him from doing so, barring federal habeas

review.

Procedural default may occur in two ways.[36/]  First, a petitioner procedurally defaults a claim

if he does not "comply with state procedural rules in presenting his claim to the appropriate state

court."[37/] States often enforce rules that a defendant cannot complain if they did not object at the time

a ruling was made.

Second, procedural default can occur where a petitioner does not properly make the same

constitutional argument in state court and the state's procedural rules stop the defendant from raising

a new claim.[38/]

In both, federal courts do not second guess state court rulings on state law issues.  And if state

court procedures – specifically state court rules that require defendants object to ruling raise those

---

[35/] 28 U.S.C. § 636(b)(1).
[36/] *Williams v. Anderson*, 460 F.3d 789, 806 (6th Cir. 2006).
[37/] *Id.*
[38/] *Williams v. Anderson*, 460 F.3d at 806.

-11-

Case No. 5:11-CV-991
Gwin, J.

objections with each appeal – then federal court will not deal with those issues.  When considering

habeas claims, federal courts do not hear the unexhausted claims.  "A petitioner must fairly present

to the state courts either the substance of or the substantial equivalent of the federal claim that he is

presenting to a federal habeas court."[39]  And, "[t]o fairly present a claim to a state court a petitioner

must assert both the legal and factual basis for his or her claim."[40]  To determine whether a federal

legal claim has been fairly presented to the state court, a federal habeas court considers whether:

> 1) the petitioner phrased the federal claim in terms of the pertinent
> constitutional law or in terms sufficiently particular to allege a denial
> of the specific constitutional right in question;
>
> 2) the petitioner relied upon federal cases employing the constitutional
> analysis in question;
>
> 3) the petitioner relied upon state cases employing the federal
> constitutional analysis in question; or
>
> 4) the petitioner alleged "facts well within the mainstream of [the
> pertinent] constitutional law."[41]

Where a petitioner has not fairly presented a federal legal claim to the state court, the petitioner has

failed to exhaust a claim.  And, where state appellate rules prevent a defendant from raising the claim

at the current time, petitioner's unexhausted federal legal claims are procedurally defaulted under the

Ohio doctrine of res judicata.[42]

Where a petitioner procedurally defaults by failing to make an argument to the state courts,

the petitioner forfeits that claim in later proceedings unless the petition can show both cause for, and

---

[39] *Hicks v. Straub*, 377 F.3d 538, 552 (6th Cir. 2004).

[40] *Anderson*, 460 F.3d at 806.

[41] *Hicks*, 377 F.3d at 553 (quoting *McMeans v. Brigano*, 228 F.3d 674, 681 (6th Cir. 2000)).

[42] *Anderson*, 460 F.3d at 806; *Coleman v. Mitchell* 244 F.3d 533, 538 (6th Cir. 2001) (citing *State v. Perry*, 10 Ohio Sr. 2d 175 (1967))).

-12-

Case No. 5:11-CV-991
Gwin, J.

prejudice resulting from, the default.[43/]

Petitioner Cutts objects to the Magistrate Judge's findings of procedural default with regard to (1) a portion of ground one; (2) ground four; (3) ground seven; and (4) ground eight.[44/]  The Court finds that the Magistrate Judge Burke correctly found that Petitioner procedurally defaulted each of these grounds for relief.

**1.  Objection I: Portion of Ground One**

Magistrate Judge Burke found Petitioner Cutts failed to make the argument to the Ohio courts that the verdicts were inconsistent (*i.e.*, his argument that "the jury's findings on the counts dealing with the deaths of the mother and the unborn fetus were inconsistent based on the evidence presented").[45/]  By failing to make this argument to the Ohio courts, Magistrate Judge Burke found Cutts had defaulted this argument.

Petitioner Cutts objects to Judge Burke's finding that he defaulted this argument.[46/] Cutts says he made similar arguments in both his direct appeal and his appeal to the Ohio Supreme Court.[47/] He further says that in federal habeas proceedings, he "simply reworded his Argument, but the claims and issues are legally and factually the same and were presented as such in the state courts."[48/] Therefore, Petitioner Cutts says, he did not procedurally default this argument because the state

---

[43/] *See Wainright v. Sykes*, 433 U.S. 72, 87 (1977).

[44/] Doc. 21 at 2-5.

[45/] Doc. 13 at 26-28. Magistrate Judge Burke concluded that this portion of Petitioner's First Ground for Relief is procedurally defaulted because "Cutts has not demonstrated that he fairly presented his claim of insufficiency of the evidence to the state court of appeals in the same manner that he now presents that claim, i.e. that inconsistent verdicts amount to insufficient evidence . . . ." *Id.* at 26.

[46/] Doc. 21 at 2-3.

[47/] *Id.*

[48/] *Id.*

Case No. 5:11-CV-991
Gwin, J.

courts reviewed the same issues now being raised to this Court.[49]

This argument loses. Petitioner Cutts failed to squarely present a federal claim to the state courts on this issue.[50]  Specifically, in direct appeal, Petitioner said that the verdicts were inconsistent but Cutts did not frame this argument in terms of a federal right.[51]  Petitioner Cutts's appeal to the Ohio Supreme Court again neglected to cite federal law or suggest that federal rights were at issue.[52]

Ohio follows the procedural rule that parties waive any issue they fail to raise on their first appeal.  Ohio's appellate procedures stops Petitioner Cutts from now bringing this federal claim to the state courts.  This portion of Ground One remains unexhausted, cannot be exhausted and, therefore, is procedurally defaulted.

### 2. Objection II: Ground Four

Petitioner Cutts says that Magistrate Judge Burke erred in concluding that his Fourth Ground for Relief is procedurally defaulted.[53]  He says that even though he did not use the phrase "due process violation" to the state court, his state court arguments still implicated a denial of his constitutional due process right.[54]

This argument also loses.  Once again, Petitioner did not make this federal claim in the state courts and state procedural rules now stop him from doing so.  In his brief to the Ohio Court of Appeals, Petitioner Cutts did not argue any federal constitutional law and did not present his

---

[49] *Id.*

[50] *See Hicks v. Straub*, 377 F.3d 538, 552 (6th Cir. 2004).

[51] *See* Doc. 9-51 (describing the second and fifth assignment of error).

[52] Doc. 9-55 at 10-12 (making Petitioner's argument with regard to proposition of law No. II).

[53] Docs. 13 at 28;  21 at 4.

[54] *Id.*

-14-

Case No. 5:11-CV-991
Gwin, J.

argument in a manner that would have alerted the state court to the federal nature of the claim.[55] Petitioner Cutts's brief to the Ohio Court of Appeals discussed only Ohio cases and Ohio law on this issue.[56] And, Petitioner's brief to the Ohio Supreme Court was similar.[57]

Therefore, Petitioner's Ground Four was not exhausted and Ohio procedural rules say it cannot be resurrected now. Petitioner has therefore procedurally defaulted this claim.

### 3. Objection III: Ground Seven

Petitioner Cutts says that Magistrate Judge Burke erred when she concluded that he procedurally defaulted Ground Seven by failing to observe Ohio's contemporaneous objection rule with regard to the admission of Blake's statements at the crime scene.[58] Cutts says he timely objected to the admission of hearsay evidence.[59] He also says that he raised this issue before the Ohio Supreme Court.[60]

The Magistrate Judge's finding of procedural default is correct. Cutts did not make a contemporaneous objection to Blake's statement. Ohio's contemporaneous objection rule requires a party to object to errors in the trial court when it occurs and can still be corrected.[61] "Failure to adhere to the 'firmly-established Ohio contemporaneous objection rule' is 'an independent and adequate state ground' of decision" that blocks habeas review.[62]

In this case, the Ohio Court of Appeals found that Petitioner Cutts failed to object at trial to

---

[55]/ *See Hicks*, 377 F.3d at 552.

[56]/ Doc. 9-51 at 15-20.

[57]/ Doc. 9-55 at 7-10.

[58]/ Docs. 13 at 31-34; 21 at 4-5.

[59]/ Doc. 21 at 4-5.

[60]/ *Id.*

[61]/ *See, e.g.*, *Jones v. Jago*, 701 F.2d 45, 47 (6th Cir. 1983) (describing that the appellant violated Ohio's contemporaneous objection rule).

[62]/ *Wogenstahl v. Mitchell*, 668 F.3d 307, 335 (6th Cir. 2012) (quoting *Keith v. Mitchell*, 455 F.3d 662, 673 (6th Cir. 2006).

Case No. 5:11-CV-991
Gwin, J.

the admission of the hearsay statements.[63/]  And, Petitioner failed to challenge that finding in any

proceeding, including in his appeal to the Ohio Supreme Court.  Ohio res judicata rules stop

Petitioner from now making this argument on any new appeal and this procedural rule stops Cutts

from raising this issue here.  Accordingly, Petitioner's seventh ground for relief is procedurally

defaulted.

### 4. Objection IV: Ground Eight

Petitioner Cutts objects to Magistrate Judge Burke's finding that he procedurally defaulted

Ground Eight.[64/]  He says that the "nature of the arguments" he made to the state courts sufficiently

raised "constitutional due process implications."[65/]

The Court finds that Petitioner's argument loses.  When Petitioner Cutts presented this

ground to the Ohio Court of Appeals, he only argued that the trial court violated Ohio Rule of

Evidence 403 when it allowed character evidence.[66/]  He did not cite federal cases or even state cases

discussing federal law.[67/]  When he appealed to the Ohio Supreme Court, Petitioner Cutts again only

contended that Ohio Rule of Evidence 403 made the bad character evidence unfairly prejudicial.[68/]

Accordingly, Cutts failed to rely on federal law and to alert the state courts to the federal nature of

his claim.[69/]  Then, once again, Petitioner Cutts failed to exhaust this federal claim in state courts, and

state procedural rules stop him from doing so now.  He  has therefore procedurally defaulted Ground

---

[63/] Doc. 9-53 at 49.

[64/] Docs. 13 at 35; 21 at 5.

[65/] Doc. 21 at 5.

[66/] Doc. 9-51 at 42-44.  Cutts made the conclusory statement that the trial court should have balanced "the constitutional rights of the Defendant without restricting the State's ability to introduce relevant evidence."  Doc. 9-51 at 44.  But, Cutts offered no indication of what those rights were.  *Id.*

[67/] *See Newton v. Million,* 349 F.3d 873, 877(6th Cir. 2003)(citing *McMeans,* 228 F.3d at  681).

[68/] Doc. 9-55 at 16-17.

[69/] *See Hicks,* 377 F.3d at 552; *see also Solether v. Williams,* 527 Fed. App'x 476, 482-83 (6th Cir. 2013) *Blackmon v. Booker,* 394 F.3d 399, 400-01 (6th Cir. 2004).

Case No. 5:11-CV-991
Gwin, J.

Eight.

### 5. Cause and Prejudice

A federal court can hear the merits of a procedurally defaulted claim if the petitioner can show "cause" for the procedural default and "actual prejudice" from the alleged error.[70]  Here, however, Petitioner Cutts shows no cause for any of his procedurally defaulted claims.

In his objections, Petitioner Cutts does not say that he has cause to excuse the procedural default of any of his claims.[71]  Because Petitioner Cutts has shown no cause for his procedural defaults, the Court need not consider the question of actual prejudice or the merits of Petitioner's claims.[72]

The Court therefore finds that Petitioner Cutts's Objections I through IV should be denied.

## B. Objections to Remaining Claims

The Court now turns to the remainder of Petitioner Cutts's objections.

### 1.        Objection VI:[73] Portion of Ground One[74]

In the second part of his First Ground for Relief, Cutts says that there was insufficient evidence to support his convictions.[75]  Specifically, Cutts says that "the State failed to present any

---

[70]  *Bousley v. United States*, 523 U.S. 614, 622 (1998) (citations omitted).

[71]  In his Traverse, Petitioner says that the Ohio Supreme Court's "restrictive 15 page limit" is cause for his failure to present any federal argument in state court. Doc. 12 at 4. This argument fails.  A requirement to write succinctly is not sufficient cause to excuse procedural default. *See Seymour v. Walker*, 224 F.3d 542, 551 (6th Cir. 2000) (discussing page limits on appellate briefs, and declining to excuse procedural default on those grounds).

[72] *See Williams v. Anderson*, 460 F.3d 789, 806 (6th Cir. 2006).

[73] Although Petitioner numbers this as his Sixth Objection, it appears in his filing as his Fifth.

[74]  Petitioner's Objection VI states "The Magistrate in its report and recommendation erroneously found that Petitioner's claim in ground nine that the guilty verdicts of murder, aggravated murder, and aggravated burglary was legally insufficient as a matter of law, and against the manifest weight of the evidence was without merit."  Although this objection refers to "ground nine," Petitioner actually discusses his first ground for relief.  Therefore, the Court interprets Objection VI as referring to a portion of Ground One, not Ground Nine.

[75]  Doc. 1 at 20-23.

Case No. 5:11-CV-991
Gwin, J.

evidence supporting the purposeful killing of either victim."[76] Cutts also says that he had the right to enter Davis's home and insufficient evidence supported the aggravated burglary conviction.[77]

Magistrate Judge Burke found that sufficient evidence supported Petitioner Cutts's conviction.[78] Petitioner objected to Magistrate Burke's finding that sufficient evidence supported Cutts's conviction. Cutts argues that the medical examiner did not say how Jessie expired and because of the jury findings, his convictions were not supported by sufficient evidence.[79] The Court disagrees.

AEDPA requires the Court to "apply two layers of deference in reviewing habeas claims challenging evidentiary sufficiency."[80] First, a court asks if, viewed in the light most favorable to the prosecution, "any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt."[81] Second, a court must still defer to a state court's determination of the sufficiency of the evidence so long as it is not unreasonable.[82]

In Ohio, murder is the purposeful killing of another.[83] Aggravated murder includes the purposeful killing of another or unlawful termination of another's pregnancy while committing burglary,[84] or the purposeful killing of a child under the age of thirteen.[85] Aggravated burglary is a trespass in an occupied structure, when another is present, with the intent to commit a crime if the

---

[76] *Id.*

[77] *Id.*

[78] Doc. 13 at 41-48.

[79] Doc. 21 at 5-6.

[80] *Moreland v. Bradshaw*, 699 F.3d 908, 916 (6th Cir. 2012).

[81] *Brown v. Konteh*, 567 F.3d 191, 205 (6th Cir. 2009) (emphasis omitted).

[82] *Id.*

[83] Ohio Rev. Code § 2903.02.

[84] Ohio Rev. Code § 2903.01(B).

[85] Ohio Rev. Code § 2903.01(C).

Case No. 5:11-CV-991
Gwin, J.

intruder inflicts physical harm on another.[86]

While Cutts testified that he did not purposefully kill Davis or her unborn child, the jury was not required to believe his testimony.  The State's case was based on strong circumstantial evidence, including the fact that Cutts told a friend he would "Kill that bitch and throw her in the woods," Cutts' actions in the time immediately following Davis's disappearance, and the nature of Davis's injuries and cause of death.[87]  A reasonable jury could infer that Cutts purposefully killed Davis and her unborn child based on this circumstantial evidence.[88]  And, since Cutts admitted that he and Davis fought before he killed her,[89] a reasonable jury could infer that Davis revoked Cutts's privilege to enter the home before he killed her, thus making him liable for aggravated burglary.[90]  Viewed in the light most favorable to the prosecution, a rational jury could have convicted Cutts on all counts.

Further, the state court reasonably held that Cutts's convictions were supported by sufficient evidence.[91]  The Appellate Court applied the standard articulated by the Ohio Supreme Court in *State v. Jenks* in its review of Petitioner's sufficiency of evidence claim.[92]  The court inquired "whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt."[93]

---

[86] Ohio Rev. Code § 2911.11.

[87] Doc. 9-53 at 34-36.

[88] *See Jackson v. Virginia*, 443 U.S. 307, 324 (1979) (describing the use of circumstantial evidence in a murder case).

[89] Doc. 9-53 at 19-20.

[90] *See State v. Steffen*, 509 N.E.2d 383, 389 (Ohio 1987) (holding that, when a person assaults another inside the victim's home, a powerful inference arises that the assailant is no longer privileged to be in the home and is liable for burglary).

[91] Doc. 9-53 at 43-44.

[92] *Id.*

[93] *Id.*

Case No. 5:11-CV-991
Gwin, J.

As Magistrate Judge Burke recognized, the Court of Appeals employed the correct standard for determining the sufficiency of evidence under *Jackson v. Virginia*. Accordingly, Petitioner Cutts fails to demonstrate that the Ohio Court of Appeals' decision is contrary to or an unreasonable application of this clearly established federal law. Petitioner Cutts also fails to show that the Court of Appeals' decision is based on an unreasonable determination of the facts in light of the evidence presented.

### 2. Objections VI & VII: Grounds Two & Three

Petitioner Cutts objects to the Magistrate Judge's findings that Grounds Two and Three have no merit. As to Ground Two, Petitioner Cutts says that the state court's affirmance of the trial court's decision to deny his motion for a change of venue was contrary to or an unreasonable application of various United States Supreme Court's precedents due to the "level of intensity of media coverage both print and television . . . concentrated in a small metropolitan area."[94] As to Ground Three, Cutts says that it was improper for the trial court to impanel a juror who had participated in the search for Davis's body.[95]

Both of these grounds concern Cutts's right to an impartial jury.[96] Cutts says that the jury was prejudiced against him. The Court finds that the trial court did not unreasonably apply federal law when it denied Cutts's motions on these grounds.

The moving party has the burden to show that a court should presume prejudice.[97] A jury

---

[94] Doc. 21 at 6.

[95] Doc. 1 at 26.

[96] U.S. Const. amend. VI.

[97] *See Irvin v. Dowd*, 366 U.S. 717, 723 (1961) ("Unless [the challenger] shows the actual existence of such an opinion in the mind of the juror as will raise the presumption of partiality, the juror need not necessarily be set aside.").

Case No. 5:11-CV-991
Gwin, J.

need not be completely ignorant of the case and charges in order to be impartial.[98/]  "A presumption of prejudice . . . attends only the extreme case."[99/]  Such an extreme case occurs when there is "a circus atmosphere" or the trial court lacks "the solemnity and sobriety to which a defendant is entitled."[100/]  A jury with actual prejudice also violates the defendant's rights.[101/]  But, the trial court is generally allowed to believe the jurors' statements that they can remain impartial, even when the jurors have previously formed some opinions about the case.[102/]

In ruling on Cutts's motion for a change of venue, the trial court found that Cutts failed to show a "circus-like atmosphere" that tainted the jury pool.[103/]  As to actual prejudice, the trial court performed an extensive voir dire,[104/] which included questionnaires, conferences, and personal questions to the jurors.[105/]  The selected jurors swore to be objective in their determinations.[106/]  The trial court held that Cutts failed to show any prejudice among the jury.[107/]

As to Ground Two, the Court finds Cutts does not show that the trial court unreasonably applied or contradicted clearly established federal law when it denied Cutts's motion to change venue.  The trial court found that Cutts did not meet his burden to show prejudice.[108/]  In doing so, trial court distinguished Cutts's case from those where the defendant was entitled to a change of

---

[98/] *Skilling v. United States*, 130 S.Ct. 2896, 2915 (2010) (internal citations omitted).

[99/] *Id.*

[100/] *Murphy v. Florida*, 421 U.S. 794, 799 (1975) (discussing *Estes v. Texas*, 381 U.S. 532 (1965) and *Sheppard v. Maxwell*, 384 U.S. 333 (1966)).

[101/] *See Irvin*, 366 U.S. at 723.

[102/] *Patton v. Yount*, 467 U.S. 1025, 1036 (1984) (holding that the question of whether jurors can be objective "is plainly one of historical fact: did a juror swear that he could set aside any opinion he might hold and decide the case on the evidence, and should the juror's protestation of impartiality have been believed").

[103/] Doc. 9-62 at 159-60 (discussing *Rideau v. Louisiana*, 373 U.S. 723 (1963) and *Irvin*, 366 U.S. 717).

[104/] Doc. 9-16.

[105/] Doc. 9-62 at 161-69.

[106/] *Id.*

[107/] *Id.*

[108/] Doc. 9-45.

-21-

Case No. 5:11-CV-991
Gwin, J.

venue.[109]  Even accepting Petitioner Cutts's argument that the press coverage was extensive, a jury

is not required to be entirely ignorant of the crime.[110]  The trial court removed jurors who could not

be impartial and believed some jurors who said they would be impartial.[111]  In doing so, the trial

court did not unreasonably apply federal law.

As to Ground Three, the Court does not find that the trial court erred when it allowed a juror

who had participated in the search for Davis to remain.  The trial court found credible the juror's

statements, both in pre-trial questionnaires and during voir dire, that she would be objective in her

duties.[112]  While a juror participating in the search for the victim raises some concern over that

juror's impartiality, as Magistrate Judge Burke recognized, Petitioner Cutts fails both to demonstrate

how the Ohio Court of Appeals unreasonably applied the relevant precedent and to identify clearly

established federal law requiring a finding of implied bias where a prospective juror has assisted in

a search for the victim.[113]

Additionally, Petitioner Cutts's claim as to Ground Three fails because Cutts fails to present

evidence of actual prejudice.  The search for Davis's body played a minimal role in the State's case

against Cutts; the State had strong circumstantial evidence, including evidence about Cutts' actions

immediately before and after the killings.[114]

---

[109] Doc. 9-62 at 159-61.  The trial court found that the news coverage was not as prejudicial, nor was the area so dominated by news coverage, as in the cases where the defendant was entitled to a change of venue.  *Id.*

[110] *Skilling*, 130 S.Ct. at 2915.

[111] Doc. 9-62 at 165-66.

[112] *Id.* at 165-69.

[113] *See Johnson v. Luoma*, 425 F.3d 318, 326 (6th Cir. 2005) (holding that the "'extreme' or 'exceptional' cases" required for implied bias include a juror's close relationship with the victim, juror's employment for a party, or that the juror was a participant in the criminal activity).  A member of a search party days after the murder is not a "participant in the criminal activity," nor is there anything on the record to suggest that the juror had a relationship with Davis.  *See* Doc. 13 at 57-58.

[114] Doc. 9-53 at 34-35.

-22-

Case No. 5:11-CV-991
Gwin, J.

"The burden is upon appellant to demonstrate juror bias or prejudice."[115/] Where an appellant

fails to develop the record regarding possible bias, he is unable to meet his burden.[111/]  On direct

appeal to the Ohio Court of Appeals, Cutts never ordered the voir dire transcript and did not include

it in his appellate briefing.[112/]  The prosecuting attorney argued Cutts deliberately did not include the

juror voir dire transcript.[113/]  "When portions of the transcript necessary for resolution of assigned

errors are omitted from the record, the reviewing court has nothing to pass upon and thus, as to those

assigned of errors, the court has no choice but to presume the validity of the lower court's

proceedings, and affirm."[114/]

Moreover, though Cutts included in his appellate appendix the questionnaire from the juror

indicating that she participated in a search for the victim, he failed to develop the record regarding

whether the juror's experience on the search committee would affect whether her ability to remain

impartial.  The entirety of Cutts's argument to the Ohio Court of Appeals on the juror bias issue was

only a page long and did not provide any details regarding the background of the juror's responses

during voir dire.[115/]  Cutts did not provide information from which to conclude that the juror who

participated in the search was unable to be impartial or fair.[116/]  In fact, the only evidence regarding

whether the juror had formed a belief that Cutts was guilty or not guilty is her questionnaire

---

[115/] *State v. Mayer*, 2000-Ohio-2008, at *13 (Ohio App. Ct. 2000).

[111/] *See id.*

[112/] *State v. Cutts*, 2009-Ohio-3563 (Ohio App. Ct. 2009).

[113/] Appellee Br., *State  v. Cutts,* No. 2008 CA 00079 (Ohio Ct. App.) at 45-46.

[114/] *State v. Reinhardt*, 2004-Ohio-644, at *13 (Ohio App. Ct. 2004) (citing *Knapp v. Edwards Labs.,* 61 Ohio St.2d 197, 199 (1980) ; *State v. Wilhelm*, Knox App. 2004–Ohio–5522, at ¶ 16) (quotation marks omitted).

[115/]  Appellant Br., *State  v. Cutts,* No. 2008 CA 00079 (Ohio Ct. App.)  at 49.

[116/] *Cf. State v. Moorehead*, No. 95APA09-1116, 1996 WL 239643 (Ohio App. Ct. May 9, 1996) (concluding that appellant had not demonstrated prejudice because the trial court had appeared to "clarified the absence of prejudice by interviewing all affected jurors on the subject").

-23-

Case No. 5:11-CV-991
Gwin, J.

indicating that she had not.[117] Since under such circumstances it is impossible to show "the actual

existence of such an opinion in the mid of the juror as will raise the presumption of partiality," Cutts

has not met his burden  to show that the juror was impermissibly biased.[118]

Thus, the Ohio Court of Appeals correctly found "Appellant still has the affirmative duty to

demonstrate in the record prejudicial error. . . . While such prejudice may have been evident from

review of the entire voir dire process, the limited portion of the transcript Appellant chose to include

in the appellate record does not affirmatively demonstrate prejudicial error."[119]

Given the limited record given the Ohio Court of Appeals, Cutts made no showing that the

trial court erred in not removing the juror for cause.  Petitioner Cutts also does not show actual

prejudice as to Ground Three.

### 3. Objection VIII: Ground Five

Petitioner Cutts objects to Magistrate Judge Burke's finding that the trial court did not violate

Cutts's Sixth and Fourteenth Amendment rights when it did not use drivers licenses rather than voter

registration to assemble the juror venire.  Specifically, Cutts says that the lack of African-American

jurors was a violation of his rights.[120] He says that the composition of the jury provided a legal basis

for the court to act to ensure a diverse jury representing a cross-section of the population.[121]

The Court finds that Ground Five does not succeed.  Cutts fails to show that the state courts

unreasonably applied clearly established federal law.  A defendant is entitled to a method of selecting

---

[117] Appellant Br., *State  v. Cutts,* No. 2008 CA 00079 (Ohio Ct. App.)  at 83.
[118] *State v. Saunders*, No. 1896, 1993 WL 524968, at *7 (Ohio Ct. App. 1993).
[119] *Id.*
[120] Doc. 21 at 8.
[121] *Id.*

Case No. 5:11-CV-991
Gwin, J.

the jury that allows for juries that are "representative of the community."[122]  This does not mean,

however, that the jury in each case needs to "mirror the community" in every respect.[123]  In order

to show a constitutional violation, the defendant must show "underrepresentation [of a distinct

group] is due to systematic exclusion of the group in the jury-selection process."[124]

  The Court finds that Petitioner Cutts is unable to show evidence that the system is

discriminatory; Cutts fails to offer any evidence of such "systematic exclusion."  Cutts instead relies

on the fact that the impaneled jury at his trial was entirely white, and that the impaneled jury in co-

defendant Ferrell's trial was also entirely white.[125]  But, information on petit juries in two cases is

not a showing of a systematic exclusion of a distinct group.[126]  The trial court reasonably found that

Cutts failed to show a systematic violation.[127]  The Court finds that the trial court reasonably applied

federal law.

  **4.  Objection IX: Ground Six**

  Petitioner Cutts objects to Magistrate Judge Burke's finding that Ground Six has no merit,

saying the Magistrate Judge erred when she "accepted the Respondent's statement that the Petitioner

had failed to request a pre-trial disclosure of Richard Mitchell's grand jury testimony as a basis that

there was no particularized need for disclosure of the grand jury testimony of Mitchell."[128]

---

[122] *Taylor v. Louisiana*, 419 U.S. 522, 527 (1975).

[123] *Id.* at 538.

[124] *Duren v. Missouri*, 439 U.S. 357, 364 (1979).

[125] Docs. 9-51 at 36-37; 9-55 at 16.

[126] *Cf. Duren*, 439 U.S. at 366 (holding that a discrepancy in every weekly venire for nearly a year is evidence of a systematic exclusion).

[127] Doc. 9-59 at 28-30.  The trial court, using data from a study on jury selection in Ohio, concluded that using registered voter records was a fair and unbiased method of selecting potential jurors. *Id.*  Cutts failed to offer sufficient evidence to contradict this finding.

[128] Doc. 21 at 9.

Case No. 5:11-CV-991
Gwin, J.

A defendant is not ordinarily entitled to grand jury testimony.[129] The Supreme Court has said that, in federal cases, a court can grant a defendant access after "a strong showing of particularized need for grand jury materials."[130] The Ohio Supreme Court has followed the federal court system and adopted a "particularized need" test for grand jury materials.[131] The defendant shows a particularized need when the disclosure is necessary to "'impeach a witness, to refresh his recollection, to test his credibility and the like.'"[132]

To the extent that Petitioner Cutts relies on state procedural rules, his ground is noncognizable in a habeas proceeding.[133]

To the extent that Petitioner Cutts asserts a due process claim for failure to provide the grand jury transcripts, the Court finds that Cutts loses.  Though Petitioner claims he was "sand-bagged" at trial by Mitchell's testimony, this is untrue.  As Magistrate Judge Burke recognized, Petitioner Cutts does not dispute the facts that (i) he did not ask for pre-trial disclosure of Mitchell's grand jury testimony; (ii) the State had identified Mitchell as a witness; and (iii) Cutts's investigator had the opportunity to talk to Mitchell in advance of trial.[134] The Court therefore finds Cutts thus fails to show a violation of his due process rights.  This objection loses.

### 5. Objection X: Ground Nine

Petitioner Cutts objects to the Magistrate Judge's recommendation that Ground Nine be

---

[129] *See Butterworth v. Smith*, 494 U.S. 624, 630 (1990) ("[G]rand jury secrecy remains important to safeguard a number of different interests.").

[130] *United States v. Sells Eng'g, Inc.*, 463 U.S. 418, 443 (1983).

[131] *State v. Greer*, 420 N.E.2d 982, 989 (Ohio 1981) (holding that, upon a showing of a particularized need for grand jury materials, the trial court may properly grant access).

[132] *Id.* at 986 (quoting *United States v. Procter & Gamble Co.*, 356 U.S. 677 (1958)).

[133] *See Trevino v. Thaler*, 133 S. Ct. 1911, 1916 (2013); *Sutton v. Carpenter*, No. 12-6310, 2014 WL 1041695, at *2 (6th Cir. March 19, 2014).

[134] *See* Doc. 13 at 66.

Case No. 5:11-CV-991
Gwin, J.

denied.  Magistrate Judge Burke found that Petitioner Cutts's Ground Nine asserted a claim based on a violation of state law not appropriately addressed in a habeas proceeding.[135] She also found that, to the extent Petitioner Cutts tried to assert a federal claim, Petitioner Cutts had waived claims premised on double jeopardy and on *Blakely v. Washington*.[136]

Now, Petitioner Cutts says that the trial court violated his due process rights when the trial court imposed maximum and consecutive sentences, when the convictions arose out of "one singular act."[137] He says that the although he raised challenges to the trial court based on state law, "the actions of the State courts implicated the Petitioner's Due Process and Sixth Amendment rights."[138] He also says that the trial court imposed a maximum and consecutive sentence although the jury found the Petitioner not guilty of one count of aggravated murder and that this violated *Blakely v. Washington*[139] because the court gave "no consideration to the jury's findings and rejected their recommendation."[140]

To the extent that Petitioner Cutts asserts a Federal Double Jeopardy claim in his objection, Petitioner Cutts has procedurally defaulted this argument.  Neither Cutts's petition nor his Traverse contained a specific double jeopardy claim based on his convictions and sentences.  The arguments he did raise only relate to his claim that the state courts incorrectly applied state law.  Petitioner Cutts did not support his argument with federal precedent.  Nor, did he demonstrate that the Ohio Court of Appeals' well-reasoned determination that the offenses at issue were not allied offenses were an

---

[135] *See id.* at 67.

[136] *See id.*  at 67-68; 68 n. 40, n. 42.

[137] Doc. 21 at 9.

[138] *Id.* at 9-10.

[139] 124 S.Ct. 2541 (2004).

[140] Doc. 21 at 9-10.

Case No. 5:11-CV-991
Gwin, J.

unreasonable application of clearly established federal law.[141] Accordingly, Cutts waived any Double Jeopardy claim by failing to sufficiently develop it throughout federal habeas proceedings in this Court.

Similarly, the Petitioner Cutts procedurally defaulted any argument premised on *Blakely.* As Magistrate Judge Burke found, Cutts presented a due process claim based on *Blakely* to the Ohio Court of Appeals, but did not assert his claim before the Ohio Supreme Court.[142] Because Petitioner Cutts did not properly preserve this claim before the state court, it is not properly before this Court.[143]

Consequently, the Court finds that Petitioner's objection to Magistrate Judge Burke's finding with regard to Ground Nine has no merit.

### IV. Conclusion

For the reasons above, the Court **ADOPTS** Magistrate Judge Burke's Report and Recommendation and incorporates it fully herein by reference, and **DENIES** Cutts's Petition for a Writ of Habeas Corpus.  The Court certifies, pursuant to 28 U.S.C. § 1915(a)(3), that an appeal from this decision on Cutts's Ground Three could be taken in good faith, and the Court issues a certificate of appealability on that ground.  On all other grounds for relief, an appeal could not be

---

[141] *See* Doc. 9-53 at 58-65.

[142] *See* Doc. 9-55 at 12-13 (omitting discussion of *Blakely* with regard to Proposition of Law No. III).

[143] *See Williams v. Anderson*, 460 F.3d 789, 806 (6th Cir. 2006).

Case No. 5:11-CV-991
Gwin, J.

taken in good faith, and the Court does not issue a certificate of appealability for those

grounds.[144/]

      IT IS SO ORDERED.


Dated: April 23, 2014              s/      *James S. Gwin*
                               JAMES S. GWIN
                               UNITED STATES DISTRICT JUDGE

---

[144/] 28 U.S.C. § 2253(c); Fed. R. App. P. 22(b).